## THE CHARLES ALLEN.

*(District Court, S. D. New York.* March 13, 1882.)

1. COLLISION—CONVERGING COURSES—TUG, WHEN TO KEEP OUT OF WAY.

Where two tugs with tows were coming from opposite sides of the river upon courses converging about a point and a half, both designing to pass to the east of a buoy marking the edge of a reef, extending to the middle of the river, the tug on the port hand, having the greater speed, and having plenty of sea-room, is bound to keep out of the way, and in continuing her course in passing and crossing the bows of the other tug, thereby drawing her own stern tow against a schooner lashed to the port side of the other tug, is chargeable with gross negligence.

2. SAME—CONTRIBUTORY NEGLIGENCE—NOT STOPPING AND BACKING.

The course of the tug upon the port hand being obvious for a considerable period, the other tug, by giving no signals of dissent or danger, acquiesced in the course pursued, and, having plenty of sea-room, was bound to govern herself accordingly, and was therefore guilty of contributory negligence in not porting, and in not stopping and backing, as required by the twenty-first rule of navigation, to avoid the collision.

3. SAME—DECREE.

Though both tugs were in fault, and the tug on the port hand in a greater degree, the libel having been filed against the other tug only, the court has no option, under the rule laid down in the case of *The Atlas,* 93 U. S. 302, to refuse a decree for the whole loss.

4. SAME—PRESENCE OF PILOT ON TOW.

The collision being with a schooner lashed to the port side of the tug, the fact that the schooner had a pilot on board did not make the tug the mere servant of the schooner, so as to exempt the tug from responsibility.

In Admiralty. Libel for collision.

*Benedict, Taft & Benedict,* for libellants.

*Beebe, Wilcox & Hobbs,* for claimant.

BROWN, D. J. This is a libel by the owners of the lighter Mary to recover damages for a collision on December 12, 1876, in the East river, near the Tenth-street buoy.

The steam-tug Brilliant, having the barge Hylene in tow upon a hawser 25 fathoms in length, coming out of Newtown creek in the forenoon, took the Mary also in tow astern of the barge, and fastened to her by a hawser of about 15 fathoms. From Eighth to Fourteenth street, on the New York side of the river, is a reef marked by a buoy on its easterly edge, about opposite Tenth street, and nearly in the middle of the river. Except for vessels of light draught, the ordinary course is to the eastward of this buoy. The Brilliant, with her tow extended in a line of about 450 feet, after clearing the flats at the mouth of the creek her ordinary course to pass to the east of the Tenth-street buoy would be S. S. W., and that was the course she undoubtedly took from about opposite Twenty-seventh street, being then nearer to the Green Point shore. The Charles Allen at the same time was coming down the East river nearer to the New York shore, having in tow two three-masted schooners lashed to her sides, the Lucy D. to starboard, and the Albert Daly on her port side, each projecting about 40 feet forward of the tug. The Albert Daly was bound for New York through the sound. At Sands Point she had taken a pilot, and when at Flushing bay she had procured towage through Hell Gate by the Charles Allen, which at the same time took the Lucy D. also in tow. They had taken the channel to the west of Blackwell's island, and after passing the buoys below it, being near the New York shore, at Thirty-third street, they followed the usual course by changing about three points further to the eastward, until they reached the middle of the river off Twenty-fifth street, when they changed about one and a half points to the southward, so as to pass to the east of the Tenth-street buoy upon a course very nearly S. by W.

The witnesses differ considerably in their statements of the courses by compass, and some of these statements were wholly impossible. I have given such as the necessities of the case and the evident courses of the two tows in following the ordinary route, which both testify they did follow, show must have been pursued. The two tugs, with their tows, were therefore approaching each other upon courses converging about a point and a half. Each claimed to be ahead of the other, and to have the right of way in passing the Tenth-street buoy. I find that prior to reaching Twenty-third street the Charles Allen was ahead, and that at that point, which was about half a mile above the place of collision, the Brilliant had overtaken the Charles Allen and began to pass upon the port quarter of the latter, at about 200 feet distant. Her speed exceeded that of the Charles Allen, accord-

ing to the testimony of the captain of the Albert Daly, from one to two knots per hour. But as in traveling a full half mile from Twenty-third street to the place of collision the Brilliant had gained less than 400 feet, and their speed was about five knots, it is clear that she was passing the Allen at a rate of less than one knot per hour. From Twenty-third street each tug kept on her course until the Brilliant, having passed ahead and come on the starboard bow of the Allen, the lighter Mary was drawn against the port side of the Albert Daly, and, her mast striking the jib-boom guy of the latter, the Mary was upset. The Hylene, which was immediately ahead of the Mary, had passed the Albert Daly about 100 feet clear, and not until then, when the Mary was off the port quarter of the Albert Daly, was immediate danger of a collision apprehended; and at this point the Brilliant was some 300 feet ahead of the Charles Allen.

From the foregoing facts it is plain that the primary cause of the collision was the violation by the Brilliant of the nineteenth rule of navigation, which required her, having the Charles Allen on her own starboard hand, to keep out of the way of the latter. There was plenty of room to do so. This libel, however, has been filed against the Charles Allen alone; and, under the rule laid down in *The Atlas*, 93 U. S. 302, this court has no option to refuse a decree for the whole loss against the Allen, if she also is found in fault and no contributory negligence be chargeable upon the Mary.

On the part of the claimant it was sought to be shown that the libellant Cruise, who was at the Mary's helm, did not starboard, as he might and ought to have done, in order to keep the Mary as far to port as possible; but the witnesses of the Mary, as well as the captain of the barge ahead of him, testify to the contrary; that his helm was put to starboard, and that the Mary, at the moment of the collision, was kept as far to port as possible, so as to throw her hawser considerably out of the line of the Brilliant. Giving superior credit to the libellants for what was done upon their own vessel, substantiated as it is by the captain of the Hylene, I must find that the Mary was not in fault, and the only remaining question is whether the Charles Allen was guilty of fault or negligence which contributed to the collision.

Although it appears that a collision was not apprehended at the time the Brilliant passed the Allen, some 200 feet distant, yet as their courses were converging the danger of collision was plain from the moment when the Brilliant passed the Allen at Twenty-third street, unless the former should change her course. It soon became

obvious that she was not intending to do so, and that she was continuing to cross the bows of the Allen, and at the time of the collision she was at least a point upon the latter's starboard bow. The Hylene passed the Albert Daly much nearer than the Brilliant had done, and at this time the danger to the Mary before she had reached the Albert Daly must have been obvious, if any lookout was kept upon the latter. The twenty-first rule (§ 4233) requires that "every steam-vessel, when approaching another yessel so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse." This rule was none the less applicable to the Charles Allen because the Brilliant was already committing a fault in crossing her bows. The Mary was an innocent party and helpless. Her captain called to the Daly and the Charles Allen to keep off. The latter at last stopped and reversed, but too late to prevent the collision. It is plain that there was nothing to prevent her doing so earlier. The pilot of the Daly admits that there was nothing to prevent this. He says that he gave orders to stop the engine. The pilot of the Allen says that before receiving this order he had himself rung the bells to stop. A few moments before the collision he left the pilot-house and ran on board of the Daly to watch the Mary, and as soon as he got aboard, as he says, he gave a further order to reverse the engines. This was but a few moments before the collision. The engineer of the Allen says that he got the four bells, *i. e.,* two to stop and two to back, at the same time, but he is clearly in error, as the order to reverse was not given until the pilot had got aboard the Albert Daly, and saw that the collision was immediately impending. The engineer would not swear that there were over 25 revolutions backward before he felt the jar of the collision. That the progress of the Charles Allen was not very materially checked is evident from the fact, which the pilot testifies to, that the Mary passed along the Daly's side at about the rate of a "slow walk;" that after the Mary was upset the oil barrels with which she was loaded floated against the Charles Allen between the two schooner's bows, though the tide was ebb.

On behalf of the claimant it is said that by rule 23 the Charles Allen was required to keep her course; but rule 21, which requires steam-vessels to stop and reverse if there be danger of collision, is not among the rules cited in rule 23, to which the latter rule is applicable. Nor did the reef at the west of the buoy present any obstacle to an earlier reversal of the Allen's engines. On the contrary, the danger, if any, would be less the further the Allen was up the

river. It must have been about five minutes from the time when the Brilliant passed until the collision. Her two vessels in tow upon hawsers astern were obvious, and her course across the Allen's bows was unchanged, while the reversal of the engines could not have exceeded half or three-quarters of a minute before the collision. For this delay in an obvious emergency I do not see how the Charles Allen can be held free from fault without, in effect, abolishing the twenty-first rule, which requires a steam-vessel to stop and reverse in order to avoid a collision obviously impending.

Under rules 3 and 11 of the supervising inspector's rules, had the Charles Allen been in any doubt as to the intention or course of the Brilliant she should have given signal whistles. In suffering the Brilliant to pass her upon an obvious crossing course, and giving no whistles of doubt or of dissent or of alarm, either at the time of her passing or subsequently, she, in effect, accepted and acquiesced in that maneuver of the Brilliant, and from that time she was bound to govern herself accordingly, having plenty of room, and not to crowd upon the Brilliant's course, or upon that of her tows astern, which may be regarded as a lengthening of the Brilliant herself.

The testimony shows also that the Charles Allen was proceeding further to the east than there was any need of; that at the time of the collision the buoy was some five or six hundred feet ahead of the Brilliant, and, as her captain testifies, some 300 feet to the westward. This is confirmed by the captain of the Albert Daly, who says the buoy was about 300 yards distant, and by the testimony of Banta, the pilot of the Daly, who says that the buoy bore, at the time of the collision, about a point and a half off the bows of the Lucy D. from his own position by the mainmast of the Daly. As the Daly was 30 feet wide, the Allen 17, and the Lucy D. 35, it is plain that the course of the Allen, having the buoy, at a distance of 900 feet, so far to starboard of the Lucy D., would carry her far more than 300 feet to the eastward of the buoy; so that, if any reliance is to be placed on this pilot's testimony, there was no reason for not porting his wheel, and proceeding on a parallel course with the Brilliant, with abundant room to pass the buoy.

The evidence does not show that the tug was the mere servant of the Albert Daly, furnishing motive power only, and under the sole responsibility and control of the pilot of the latter, so as to exempt the tug from liability. *Duke of Sussex*, 1 W. Rob. 271; *Sturgis* v. *Bowyer*, 24 How. 122. The Charles Allen was conducting her own

business, manned and, at least in part, directed by her own ship's company. She had an independent tow upon her starboard side, and, so far as the evidence shows, she was no more under the control of the one schooner than of the other,—that is, she was not the mere servant of either,—but was herself in at least partial charge of the navigation of both, and certainly in charge of the management of her engines in respect to the observance of the twenty-first rule of navigation as to backing; and for her fault in this respect, notwithstanding the greater fault of the Brilliant, I am compelled, though reluctantly, to hold her answerable.

Let a decree be entered for the libellants, with a reference to compute the damages, and also their costs.