**LAMB et al. v. INTERSTATE S. S. CO. et al.**

No. 9960.

Circuit Court of Appeals, Sixth Circuit.

June 25, 1945.

Edward Lamb, of Toledo, Ohio, for appellants.

Lucian Y. Ray, of Cleveland, Ohio (Duncan, Leckie, McCreary, Schlitz & Hinslea, Lucian Y. Ray, and J. Harold Traverse, all of Cleveland, Ohio, for appellee Interstate Steamship Co.

Before HICKS, HAMILTON, and MARTIN, Circuit Judges.

HAMILTON, Circuit Judge.

On October 23, 1941, at about 1:50 o'clock a. m., while it was raining, the tug, America, was attempting to release the steamer, B. F. Jones, a bulk freighter, from the strand in the Detroit River a short distance above Belle Isle, and the America turned over and sank. The tug carried a crew of thirteen men, seven of whom drowned when she capsized.

Appellants, personal representatives of four of the deceased, instituted these ac-

tions in admiralty and at law against the Interstate Steamship Company, the owner of the steamer, B. F. Jones, and the Great Lakes Towing Company, owner of the tug, America, for the wrongful deaths of the deceased under the Michigan Death Statute. The trial court dismissed all of appellants' libels as to the Interstate Steamship Company from which decrees this consolidated appeal is prosecuted.

Appellants urge two points: (1) That the evidence shows that there was mutual fault of the America and the B. F. Jones, and that in such a case under admiralty rules where damages are caused by two tort feasors resulting in the death of an innocent third party, each is primarily liable for one-half; (2) that the Great Lakes Towing Company and the Interstate Steamship Company were engaged in a joint venture, co-operative effort and mutual enterprise in attempting to move the stranded vessel and that by reason thereof, the doctrine of respondeat superior applies to the owners of both ships.

The B. F. Jones, a bulk freighter, 538 feet long, 56 feet beam and 31 feet deep, fully loaded with iron ore, went on the strand in the Detroit River, a short distance above Belle Isle and was unable to release herself, and the Great Lakes Towing Company, under an arrangement with the Interstate Steamship Company, undertook to float her. After several unsuccessful attempts to release the Jones, the port side of the vessel became firmly embedded in the bank, lying broadside of the current and having a compass heading of about N. E. by N. The tug, America, attached her hawser to the stern of the Jones and tried to pull her into the channel, but without success. Thereupon, it was concluded to remove some of the cargo by lighter, and in order to prevent the ship from going further on the strand as her weight became less, her starboard anchor, with about 70 or 80 fathoms of chain out, was carried upstream by one of the tugs and dropped, the angle of the anchor chain from the ship, when it became fixed, being approximately 45 degrees. After about 800 tons of iron ore were removed from the Jones, it was found she could be swung from the bank in a pivoting motion but that the anchor prevented such a movement as it was so firmly embedded at the bottom of the stream. The winding mechanism of the Jones could not move the anchor and other means for separating the anchor chain from the anchor were not available. Manila lines were attached to the anchor chain and an effort made to move it by the tug, Oregon, but under strain the lines separated and nothing was accomplished. Steel cables were used but they also parted. There was then obtained from the Jones a steel shackle and the bridle of the America's towing hawser was loosely shackled around the anchor chain so as to allow free movement of the bridle up and down the chain. The America then began to pull backward and forward across the lead of the anchor chain as the Oregon had previously done, using manila lines.

The Captains of the Jones and America agreed, before the latter began to pull, that when the America had broken the anchor resulting in slack in the anchor chain, the America would give three short whistle signals, whereupon the slack thus developed would be hove in by means of the windlass of the Jones. During this maneuver, some progress was made in heaving-in slack and the length of the anchor chain was reduced to approximately 45 fathoms. The tug, America, and the tug, Oregon, were then joined and commenced to pull on the anchor chain in tandem, with the Oregon in the lead. As thus rigged the America's steel towing hawser running over the top of the drum of her towing machine was about 200 feet long and through the water was shackled around the stock of the Jones' anchor. A manila towing hawser about 40 feet in length led from the America's pawl posts forward down to the Oregon's after towing bits. The first tandem pulling was done upstream on the Jones' starboard side and then the tugs switched downstream across the bow of the Jones pulling on the lead of her anchor chain on her starboard side.

During these changing operations from up to down stream, the Jones and the Oregon commenced to move through the water with greatly accelerated speed, and the Captain of the America blew a check whistle to her engine room and also blew a similar whistle to the Oregon. The movement of the tugs abruptly halted and the America rolled to port and all on board were thrown to the floor on the port side of the pilot house and the America immediately filled with water and went down by the stern. The Oregon remained afloat. There was no parting of the cable lines from the America to the anchor chain and

there was no parting of the cable connecting the America and the Oregon.

A few minutes before the America capsized, the operator of the windlass on the Jones, in response to signals, hove in some of the anchor chain. He then placed the windlass in a pay-out position and paid out about half a link and again reversed the windlass to a pay-in position.

There is no direct evidence in the record of the origin of the tow slack which caused the two tugs to surge forward suddenly and abruptly halt. Neither tug slowed down in response to the check whistles because the accident occurred almost simultaneously with the signals.

Two qualified seamen who were on the America testified that from their experience and actual observation at the time of the accident, the chain slack which permitted the two tugs to lurch forward suddenly was caused by a pay-out of the anchor chain on the B. F. Jones' windlass and that the abrupt halt of the vessels was caused by a sudden tightening of the mechanism of her windlass. Neither of these witnesses was on the Jones at the time of the accident, nor did either see any movement of the anchor chain to or from the windlass.

The seamen operating the windlass on the Jones testified there was no pay-out of her anchor chain except a few inches or part of a link at the time of, or immediately before, the accident. The claimed negligence is the movement of the anchor chain on the Jones and this issue is determined by what weight, if any, is to be given to the testimony of the two witnesses for the libellants who expressed their opinion on the subject.

It is contended that the Master and officers of the Jones paid out the anchor chain without notice to or direction from the Masters or officers of the towing tugs and that the compressor or locking device or reversing mechanism on the windlass of the Jones was suddenly applied, which caused the immediate stopping of the America and its consequent sinking.

█ It is true that the owner of a vessel is liable in personam and the vessel is liable in rem for injuries done to persons by the negligence of the Master or crew, but the negligence must be such as would make the owner of the vessel under the same circumstances, liable in a suit at common law. If a tort is committed on navigable waters, the case becomes cognizable in admiralty. But the fact that the occurrence took place on navigable waters still leaves open the question whether the circumstances were such as to amount to a tort. The burden of proving negligence on the part of a ship, its Master or crew, which rests upon the libellant, never shifts to the respondent. The libellant must establish directly or by just inference some want of care on the part of the Master or the crew of the ship to which his injury may fairly and reasonably be traced. It is not enough for the libellant to prove that the negligence might perhaps have caused the injury. If the injury complained of might well have resulted from one of many causes, it is incumbent upon the libellant to produce evidence which will exclude the operation of those causes for which the Master or the crew is under no legal obligation. If the cause of the injury may be as reasonably attributed to an act for which the Master and crew is not liable as to one for which they are, the libellant has not sustained the burden of fastening tortious conduct upon the Master or crew. The evidence showing negligence must come from witnesses who speak as knowers, not as guessers.

In the case at bar, the tugs were switching upstream and downstream and were creating water swells by their movements. The bridle on the anchor chain was free to slide up and down. The slack in the tow line from the America to the anchor chain could have been created by the switching movement of the ship or by slides on the anchor chain and the abrupt halt of the ship could have been caused by a sudden grab of the bridle on the anchor chain. Of course, it could have been caused by the pay-out of the anchor chain on the windlass of the Jones, or by its reversing mechanism or by a sudden application of the compressor.

█ A fair appraisal of the evidence leaves the cause of the accident open to pure speculation. The question of what was the cause of the rapid movement of the tugs forward and their sudden halt is a matter of opinion; nobody can swear just what it was. It was competent for the seamen on the scene conversant with the facts to give their opinion deduced therefrom in the light of their experience. But when the testimony of these witnesses is weighed along with the testimony of

those controlling the movements of the windlass on the Jones, the libellants failed to sustain the burden of fastening tortious conduct upon the Master or crew of the Jones.

■ While appeals under admiralty rules are heard de novo, nevertheless a finding on a question of fact by an admiralty court, which saw and heard the witnesses, will be accepted by the appellate court unless the evidence greatly preponderates against it. Globe S. S. Co. v. Moss, 6 Cir., 245 F. 54. There is no preponderance in the evidence here in favor of the appellants.

■ While the general rule is that the master is liable for the acts of his employees done within the scope of their employment, it is equally well settled that the rule applies only when the relation of master and servant is shown to exist between the wrongdoer and the person sought to be charged for the wrong at the time of the injury and with reference to the very transaction out of which the injury arose; otherwise, the doctrine of respondeat superior does not apply.

■ There is nothing in the evidence in the case at bar from which an inference could be drawn that the Captain and crew of the tug, America, may be said to have been the agents or servants of the owners of the B. F. Jones or seamen of that ship. They were, in no sense, under the control of, or subject to the orders of the Master of that ship, but on the other hand, they were the servants and agents of the Master or owners of the tug America and were amenable to them in the discharge of their duties.

The owners or agents of the B. F. Jones had no part in the employment of the members of the crew of the America, nor did the owners or agents of the Jones have any authority to remove or discharge the persons employed on the America, nor did the Master of the Jones have any authority to order what should be done on the America. The mode and manner of performance of the work of the America was solely under the control of its Master.

It is true the Master of the Jones furnished a steel shackle which was attached to the anchor chain and that the Master of the Jones consulted and advised with the Masters of the tugs, America and Oregon, as to how the work of releasing the Jones was to be done, but no one connected with the Jones exercised or had any control over the details of the movements of the tugs. The tugs furnished their own crews, pursued their own course, regulated the length of the lines, the movement of the vessels and the order in which the two tugs were to be lined. All of this was done irrespective of the wishes of the Master of the Jones. The respondent, The Great Lakes Towing Company, was engaged in the business of freeing stranded vessels on the Great Lakes and made a special rate for this type of work. It was employed by the Interstate Steamship Company for the specific purpose of releasing the Jones.

There can be no doubt the America was engaged in the service of the B. F. Jones, but there is no evidence whatever that the latter vessel led the former into the difficulty which resulted in the disaster in which libellants' deceased lost their lives. Under the circumstances of this case, the court is of the opinion that respondent is not responsible for damages arising from the negligence or unskillfullness of the Master, officers or crew of the tug, America. The relationship which the towing company bore to the interstate company was that of independent contractor. Sturgis v. Boyer et al., 24 How. 110, 65 U.S. 110, 16 L.Ed. 591.

Decrees affirmed.