## THE ST. FRANCIS.
## THE WINDING GULF.
### No. 2757.

District Court, D. Maryland.
June 10, 1947.

John H. Skeen, John H. Skeen, Jr., and Frank, Skeen & Oppenheimer, all of Baltimore, Md., for libelant.

Bingham, Dana & Gould, Chas. S. Bolster, and Seymour P. Egerton, all of Boston Mass., and Niles, Barton, Morrow & Yost and Theodore R. Dankmeyer, all of Baltimore, Md., for the Winding Gulf.

CHESNUT, District Judge.

This case grows out of a collision at sea between the "SS Winding Gulf" and an obsolete "Destroyer" being towed in tandem with another old Destroyer, both belonging to the Boston Iron & Metal Company, a Maryland corporation, which had recently purchased them from the Canadian Government for scrapping. The place of the collision was in the open waters near Buzzards Bay, Massachusetts. The time was about 10 P.M. (E.W.T.) July 13, 1945.

The Boston Company had entered into a towing contract dated July 3, 1945, with the Foundation Maritime, Ltd., a Canadian towing corporation, to furnish motive power for towing the two Destroyers from Sydney, Nova Scotia, to Baltimore, Maryland, by way of the Cape Cod Canal around Block Island (off the east coast of Long Island), the Delaware Bay and the Chesapeake and Delaware Canal to Baltimore. The voyage from Sydney through the Cape Cod Canal was without incident. After traversing the Canal the tow was reassembled in charge of a tug (the Peter Moran) furnished by the Moran Towing Company of New York for Foundation Maritime, Ltd. To the towing contract were annexed printed conditions which include the following: "The master and crew of such tug or tugs used in the said services become the servants of and identified with such vessel or craft and their owners, and that the Tug Company only undertakes to provide motive power."

As a result of the collision the particular Destroyer known as the "1–24" subsequently sank and became a total loss. There was also some substantial damage to the stem of the Winding Gulf. On November 14, 1945, the Boston Company filed its libel in this court against the Winding Gulf to recover damages for the loss of the Destroyer. The Massachusetts Trustees of Eastern Gas & Fuel Association filed a claim in the case as owner of the Winding Gulf, and also a cross-libel in personam against the Boston Company. They have also filed and there is now pending a libel against the tug Moran or its owner, in the Southern District of New York. Answers were filed by the respective respondents to the claims in this court and extensive testimony has been taken and arguments of counsel have now been heard.

As is frequently the case in maritime collisions of this nature, there is much controversy and uncertainty as to the precise conditions and causes of the collision. In this case the evidence is conflicting with

respect to (1) whether the hawser connecting the Destroyer with the tow had parted before the collision; (2) whether the Destroyer had proper lights and was properly manned before and at the time of the collision; (3) whether the Winding Gulf was justified in maintaining her course, direction and speed shortly before the collision by reason of the fog; (4) the density of the fog at the time and (5) whether the length of the tow from the tug was unreasonably long for the time and place. The difficulty in determining the precise and actual facts is enhanced in the particular case by (a) the absence of any person or persons as a crew on board the Destroyer at the time of the collision; (b) the entire absence of any evidence to show where or how the hawser was parted other than the probable result of the collision and (c) the fact that the evidence of the principal witnesses for the Boston Company was necessarily taken by deposition instead of in court.

In reaching a conclusion as to the ultimate facts it will be helpful to first state such of the facts of the case as are definitely and clearly established without substantial contradiction.

The tug was of adequate size and power for the towing. The Winding Gulf was a steam vessel of the three island type of superstructure, about 400 feet long, 55 foot beam and 35 foot depth carrying a cargo of coal from Newport News, Virginia, through Long Island Sound by way of the Cape Cod Canal to Boston. The two Destroyers were in tow in tandem. They consisted of the "I-93", the first in the tow, and the "I-24", the second and last vessel in the tow. The I-93 was connected with the tug in the usual adequate way first by a wire pennant 50 feet long and a new 11-inch manila hawser. In turn the I-24 was connected with the I-93 by similar wire pennant and a 10-inch hawser about 5 to 6 months old but in good condition. The Destroyers were each about 300 feet in length. The length of the tow line from the tug to the first Destroyer was 250 fathoms (1500 feet) and the length of the tow line from it to the I-24 was 200 fathoms (1200 feet). With the length of the two Destroyers the whole tow from the tug to the stern of the I-24 was thus about 3300 feet, or about three-fifths of a mile. Neither Destroyer had any member of a crew on board, neither had any motive power, and both were "dead" ships.

Shortly before the collision the course and direction of the tug was southwest by west; while the course of the Winding Gulf was east by one-half north. The Winding Gulf was displaying the usual navigation lights for a vessel of her class and size. The tug displayed, among other lights, three white lights vertically arranged signifying a tow in the rear. The lights did not indicate how many vessels were in tow nor the length of the tow. The first Destroyer in the tow line had one white light displayed in proper place; the second Destroyer had two lights, one white and the other intended to be white, in proper place, indicating that it was the last vessel in the flotilla. A fog set in between 8 and 9 o'clock P.M. The master and deckhand on the tug testified that they saw the lights on both Destroyers just before the fog shut them out, about 9 P.M., shortly after the tug passed Hen and Chickens Lightship.

Fog signals were being sounded both by the Winding Gulf and the tug. The two vessels heard each other's fog signals and also saw their respective lights when the Winding Gulf was about half a mile to the west of the tug, and two points on the starboard bow of the tug. When the two vessels came abreast of each other the Winding Gulf was about a quarter of a mile distant to the north of the tug. The tug was proceeding about southwest and the Winding Gulf nearly due east. The speed of the tug was about 4 knots an hour and that of the Winding Gulf about 6 knots per hour. In this situation it is fairly apparent that the course of the Winding Gulf, unless changed, would intersect the flotilla at some point. The Winding Gulf did not change either its speed or its course with the exception that shortly thereafter the master changed his course for three or four minutes to one point to the north, not for the purpose of avoiding the tug or tow but because he desired to steer somewhat closer to the buoys on his north. The master of the Winding Gulf, who was on the bridge at

the time, frankly admitted that he did not know or suspect the length of the tow line, and thought a quarter of a mile distance between his ship and the tow was quite sufficient to clear the tow, especially after he had looked for and failed to see anything in tow of the tug through his binoculars.

The exact time when the two ships came abreast as above described is uncertain. The master of the Winding Gulf, Captain Godfrey, testified that he had passed on his north "U" buoy at 9.21 P.M. as recorded on the ship's log; that he saw the lights of the tug a few minutes thereafter, at say 9.25, and that he was abreast of the tug and passed it about 9.35. From "U" buoy to the next buoy "V" was two and one-half miles. He passed "V" buoy at 9.45 according to the log time, and the collision with Destroyer I-24 occured at 9.54 by the clock on the bridge and 9.51 by the engine room clock, which, it is said, was three minutes slower. Immediately before the collision occurred the lookout on the Winding Gulf, about 125 feet forward from the bridge, sounded the bell and ran down the ladder and called to the bridge that there was an object dead ahead. Before the lookout could get back to his post the collision had occurred. The stem of the Winding Gulf struck the starboard aft side of the Destroyer. The lookout had seen no lights on the Destroyer before the collision but immediately thereafter did see what he described as a dim red light at the masthead and another dim white light on the other side of the yardarm. Immediately on notice of imminent collision the master telegraphed the engine room to stop the engines. The time recorded on the engine room clock was 9.51. After the collision others on the Winding Gulf also saw the lights mentioned on the Destroyer. The adequacy of these lights will be later discussed. At 10.10 P.M. the Winding Gulf sent a radio message to the Coast Guard. In it the radio operator described the fog at that time as a "dense fog". The Coast Guard responded and endevored to tow the Destroyer to land but she sank before reaching land. Before pulling away from the Destroyer Captain Godfrey ascertained that there was no one on board the Destroyer by numerous loud blasts of the ship's whistle. He also ascertained that his own ship had been damaged and was slowly leaking forward. He then proceded to put her in a position of safety before continuing the voyage.

We return now to the activities of the tug upon first seeing the lights of the Winding Gulf half a mile to the west. The tug had a crew of about 15 men but only the master, a Captian George, and a deckhand, one Mackey, were on deck. The depositions of both were taken. The master testified that on sighting the Winding Gulf he blew two blasts of the whistle to signify an intended starboard passage, and received a similar confirmation from the Winding Gulf. When the vessels were abreast he feared that the course of the Winding Gulf would intersect the tow and thereupon, as he testified, he sounded the danger signal on the tug's whistle. He also said that the tug in addition to the three vertical white lights indicating a tow, had two red lights displayed which he said was a warning light about the tow or indicated a tow not under complete control. Pursuant to the signals for a starboard passage he changed his course about four points to the south but noticed that the Winding Gulf did not change her course. A few minutes after passing the Winding Gulf (estimated by Mackey as about four or five minutes) he noticed that the tug was picking up speed and immediately inferred that one of the Destroyers was off the tow line and telephoned or radioed for help to the Coast Guard. He then circled around for several hours but did not learn until the next morning what had happened.

The most important fact in controversy is whether the hawser of the Destroyer had parted before the collision. On behalf of the Winding Gulf it is contended that it had and that the Destroyer was at the time of the collision a "dead" ship, loose and adrift without crew, motive power or adequate lights. There is no physical evidence in the case where or when or how the hawser parted and the Destroyer thereupon became disconnected from the tow other than the reasonable inference that the parting of the hawser was due to the impact of the collision. The contention on the part of the Winding Gulf that the hawser had

parted and the Destroyer was loose and adrift prior to the collision is based solely on estimates of time and distance by Captain Godfrey. Reliance is placed on the circumstantial evidence that there must have elapsed a period of time variously estimated at 9 to 15 minutes or more between the time of passing the tug and the collision. More specifically, the argument is that as the Winding Gulf was making 6 knots per hour, or about a mile in ten minutes, it would necessarily have struck the Destroyer or some part of the tow line within less than 9 minutes after passing the tug if the second Destroyer had still been on the tow line connected with the first destroyer, because the tow line was only about three-fifths of a mile long. There is also some little additional circumstantial evidence brought forward on behalf of the Winding Gulf in support of its contention. Thus, it is said. that at the time of the collision it did not definitely appear that the Destroyer was going forward in the water and, perhaps less importantly, it is suggested that if the tug had been only three-fifths of a mile distant at the other end of the tow line at the time of the collision the master of the tug must have heard the loud blasts from the Winding Gulf just after the collision.

Counsel for the Winding Gulf also submits an argument implemented by superimposing on a chart of the waters in question, a diagram of the course of the Winding Gulf and the tug respectively said to be based on the evidence given by their respective captains, to the effect that the course of the Winding Gulf would not and could not have intersected the tow line. The course of the Winding Gulf so diagramed seems to be correct from the evidence; but the course of the tug as so plotted is based on uncertain assumptions, and I am not able to say in view of the uncertainties, that the thus projected course of the tug is correctly outlined in the diagram.

I have given careful consideration to the several contentions made on behalf of the Winding Gulf that the I-24 had broken loose from the flotilla at the time of the collision, but weighing the evidence as a whole I have reached the contrary conclusion. There are several important considerations which lead to this conclusion: (1) There is no direct or definite evidence that the hawser of the I-24 had parted before the Winding Gulf and the tug came abreast of each other; (2) the collision occurred certainly within a few minutes after this point of time; (3) the sea was calm with little or no wind; (4) the hawsers in the tow line were adequate and in good condition; (5) it is quite improbable that the hawser parted in the very few minutes elapsing between the passage of the two vessels; (6) the stated course of the Winding Gulf would apparently have intersected the flotilla at some point in a few minutes in view of the distances and courses of the Winding Gulf unless changed; (7) and it is quite significant that Captain Godfrey, on the bridge of the Winding Gulf, testified that if he had known the length of the tow line he would have altered his course. The main contention of the Winding Gulf is based on the estimated elapsed time between the passage of the two vessels and the subsequent collision. It is true that Captain Godfrey's testimony seems precise and the calculations based thereon, if the time of the passage of the two ships is accepted as given by him, would lead to the conclusion that the elapsed time was greater than would have occurred if the flotilla had been intersected by the Winding Gulf. But the uncertain point in the evidence of Captain Godfrey is as to the time of the passage of the two ships; and on this particular point I accept the simpler testimony of the Captain and deckhand of the tug, which was to the effect that within four or five minutes after the two ships were abreast they noted that the tug was picking up speed, from which the fair inference, subsequently confirmed by the discovered fact, was that the tow line had parted. And this is entirely consistent with the courses and distances of the vessels.

On the affirmative side I conclude that the explanation given by the master and deckhand of the tug is more reasonable and probable. While not based on recorded time elapsing nor mathematical computations, it seems to me more probable in view of the known facts. It was to the effect, as previously mentioned, that within a few minutes after the two ships had passed each

other it was noticed the tug was picking up speed. In view of the known length and course of the tug and the speed and course of the Winding Gulf, it is clear that the Winding Gulf must have intersected the three-fifths of a mile tow line within five or six minutes after passing the tug. There is no fixed point of time by any one as to just when this passage did take place. In view of the whole situation I think the sounder view is to accept the evidence of the master and deckhand, of the tug on this point. I therefore find that the destroyer was still on the tow line at the time of the collision.

The only clear and effective cause of the parting of the hawser shown by the evidence was the collision. And this was a reasonably adequate cause. The Winding Gulf was heavily laden with a cargo of coal. Her speed was 6 knots per hour and at that speed she could not be stopped in less than a quarter of a mile. She struck the Destroyer within less than a minute after the lookout sighted her. She remained interlocked with the hulk of the destroyer for several minutes thereafter. Assuming the hawser holding the Destroyer was partly slack in the water at the moment of the collision, the forward motion of the ship due to the impact doubtless tautened and snapped the hawser.

Another important controverted matter is whether the master of the Winding Gulf was at fault in not changing either speed or course on passing the tug. He knew that the tug had a tow behind but did not know the number of vessels in tow nor the length of the tow. He was unable to locate the tow at any time through his binoculars. He says that he heard no whistle signals from the tug other than the usual fog signals and those which indicated the tug had a tow. He saw, at one time at least, a red light on the tug but assumed it was probably the usual port light. Later he failed to see even that. He also said that he heard no danger signals from the tug. He did, however, frankly concede that he would have changed his course had he known the length of the tow line. He says he assumed that the length of the hawser from the tug to tow would be not more than 75 fathoms or 450 feet, in accordance with the inland rules of navigation; but he did not know or learn how many vessels might be in tow with 75 fathoms lines. The inland rules permit four such tows in tandem with an aggregate of possibly more than 2000 feet of towage, nearly half a mile,[1] and indeed the rule does not absolutely limit the length of the tow line in any case because it provides for the exercise of the judgment and discretion of the master of the towing vessel with respect to the length of the hawser, with exceptions as to certain named localities not including the waters where this collision occurred. The master of the Winding Gulf should have known that his course unless changed might intersect the flotilla at some point. When, after passing the tug, he could not pick up any part of the flotilla through his binoculars, he still did not change his course or slacken his speed. He said he assumed he had passed the tow. This assumption was hardly a prudent one to make.

There is further uncertainty as to the density of the fog. The Captains of both the steamer and the tug said that the

[1] Authority for the regulations with respect to navigation of inland waters, which is here applicable, is to be found in 33 U.S.C.A. § 152 which presently authorizes the Coast Guard to promulgate such regulations. In accordance therewith the length of tow lines of seagoing barges within inland waters is to be found in "Comparative Rules of the Road", published by the United States Coast Guard, 1946, page 90, which reads:

"*Tows of seagoing barges within inland waters.*—Tows of seagoing barges navigating the inland waters of the United States are limited in length to five vessels, including the towing vessel or vessels

*Hawser length; general.*—With the exception noted below, hawsers are limited in length to 75 fathoms, measured from the stern of one vessel to the bow of the following vessel; and should in all cases be as much shorter as the weather or sea will permit.

*Hawser length; exceptions.*—In all cases where, in the opinion of the master of the towing vessel, it is dangerous or inadvisable, whether on account of the state of the weather, or sea, or otherwise, to shorten the hawsers, hawsers need not be shortened to the prescribed length, except that hawsers must in any event be shortened to the prescribed length upon reaching the applicable locality named below."

visibility as to the lights (not as to the bulk of the ships) was half a mile despite the fog; but other witnesses, possibly less experienced in navigation, described the fog as "dense". The inland rules require slackening of speed in fog, dependent upon its density, of course, sufficiently to insure safety and avoidance of collision.[2]

On the whole evidence I find as a fact that the Winding Gulf was at fault in maintaining her speed and course without change, and this was a proximate cause of the collision. She is therefore liable to the Boston Company for damages to the Destroyer unless there was clearly contributing fault of the tow.

The faults attributed to the Destroyer by the Winding Gulf are (1) that the flotilla was longer than permitted by the rules of navigation; (2) that the Destroyer was not properly manned by a crew and (3) she did not carry adequate lights.

With respect to the alleged improper length of the flotilla, it has been pointed out above that there is no absolute rigid length for tow lines. There is also affirmative evidence in this case by a tug captain, Cullison, who had been employed by the Boston Company for about a year after the collision and had successfully towed ten or more similar old destroyers from Canada to Baltimore, that it was the usual practice to tow them in tandem on hawsers of similar length to that used in the instant case and through these same waters. But it is also to be noted that as the tow line was of unusual length that fact imposed on the tug and tow the obligation to use great care to avoid accident. The Gladiator, 1 Cir., 79 F. 445, 446; The Mt. Hope, 1 Cir., 84 F. 910, 912; The Samuel Dillaway, 1 Cir., 98 F. 138, 141; The Gertrude, 1 Cir., 118 F. 130, 131; The Admiral Schley, 1 Cir., 131 F. 433, 434; The H. M. Whitney, 2 Cir., 86 F. 697, 700. This emphasizes the importance of a crew on the Destroyer to see that the lights were kept sufficiently brightly burning, and at least suggests the desirability of a crew equipped with whistle or fog horn to warn of the presence of the Destroyer in the unusually long flotilla. There is positive evidence of several witnesses for the Winding Gulf that the lights on the Destroyer at the time of the collision were inadequate. The dim red light referred to probably was due to the obscuration of the glass by the smoke. The other light, although white, was dim. Neither light was electric but only kerosene lamps although said to be regulation ships' lights.

I find from the evidence that the lights on the Destroyer were inadequate and insufficient at the time of the collision. I also find that it was imprudent not to provide a crew on the Destroyer to attend to the lights and to see that they were kept brightly burning, and to have equipment for the sounding of fog signals to indicate the presence of the Destroyer in this unusally long flotilla. The above named witness Cullison, called by the libelant, who was familiar with the towing of destroyers for similar voyages, testified that in his opinion the failure to provide a crew on the Destroyer was not prudent. I also find that these faults contributed to the collision. It will be remembered that the stem of the Winding Gulf struck the Destroyer on the starboard side well aft. It is thus apparent that the collision occurred only by a very narrow margin of time and could have been avoided by a slight sheer to port by the Winding Gulf, if the lights on the Destroyer had been sufficiently bright to have been seen by the lookout on the bow of the Winding Gulf shortly before he first discerned the hulk of the Destroyer dead ahead. While there is some uncertanty as to the density of the fog at the precise time, it seems highly probable that if the lights on the Destroyer had been reasonably adequate they could and would have been seen by the lookout before he observed the hulk of the vessel.

It is contended by counsel for the Boston Company that these facts are immaterial in this case because the Destroyer was an inert tow wholly under the charge of the tug and therefore the tow was not itself responsible to the Winding Gulf. Robinson on Admiralty, pp. 679–683; Sturgis v.

---

[2] "Every vessel shall, in fog, mist, falling snow or heavy rain storms, go at a moderate speed having careful regard to the existing circumstances and conditions." "Comparative Rules of the Road", published by the United States Coast Guard, p. 69 (former Pilot Rule 13); See also 33 U.S.C.A. § 157.

Boyer, 24 How. 110, 16 L.Ed. 591. And it is further argued that if there were faults with respect to the lights and absence of crew on the destroyer, the complaint of the Winding Gulf with respect thereto can be properly asserted only in the libel against the tug, or its owners, now pending in the Southern District of New York. But after much consideration I have reached the conclusion that in view of the contract between the Boston Company and the Foundation Maritime, Ltd., above referred to, these faults with respect to lights and absence of crew must be attributed directly to the owner of the Destroyer. The contract provided (1) that the Towing Company agreed to provide only motive power; (2) that the "two vessels will be taken as a double tow, that is, two vessels in tow of the one tug"; (3) that in the towage service the master and crew of the tugs used "become the servants of and identified with such vessel and craft or their owners"; and (4) that the Tug Company would not be responsible for the acts or defaults of the master or crew of the tug, nor for any damage from whatsoever cause arising that may occur either to the vessels towed or to any other ship, vessel or property of any kind. And the Towing Company was to be held harmless and indemnified by Boston Company against all such damages. It is also fairly inferable from the contract as a whole that the towage of these two old obsolete destroyers as a double tow for the long voyage from Sydney, Nova Scotia, to Baltimore, Maryland, through the two Canals, was regarded as particularly hazardous, and that the Boston Company, having purchased the destroyers for scrapping, was desirous of having them delivered in Baltimore at minimum expense of transportation, and taking all the risks of the voyage.

■■ When the contract was first offered in evidence at the trial of the case, I had the view that, being a contract between parties other than the owners of the Winding Gulf, it was probably material only for its indication that the particular towage contract was a hazardous one; but later, after inviting and receiving argument on the point from counsel for the parties, I have concluded that the provisions and subject matter of the towage contract legally result in making the faults with respect to the lights and absence of crew on the Destroyer directly attributable to the owner of the tow, and that these faults may be ascertained in this case without the circuity of action due to their first being litigated in a suit by the Winding Gulf against the tug or its owners. I assume, of course, that any question of indemnity arising under the contract could not be litigated here in this case; but nevertheless the absence of adequate lights and crew upon the Destroyer constituted defaults by the master of the tug who, by the terms of the contract, became in this respect the servant of the Boston Company. Where injury to third persons results from the faults of the tow itself the latter is directly liable to the third person. Robinson, pp. 679, 680; Sturgis v. Boyer, 24 How. 110, 122, 16 L.Ed. 591; and see The Eugene F. Moran, 212 U.S. 466, 29 S.Ct. 339, 53 L.Ed. 600, where a tow was held liable for the absence of required lights.

■■ The validity of a provision in a towage contract making the master or crew of the tug the servant of the owners of the tow has heretofore been the subject of much diverse judicial consideration. See Robinson on Admiralty, pp. 670–673. But this has now finally resulted in the establishment of the validity of such a contract. Sun Oil Co. v. Dalzell Towing Co., 1932, 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311; The Primrose, D.C., 3 F.Supp. 267; The H. C. Jefferson, D.C., 69 F.Supp. 650. The prevailing underlying principle is based on the proposition that a tug is not a common carrier and therefore the Towing Company may stipulate against its own negligence or default.

■ My conclusion as to the ultimate facts, therefore, is (1) that the Winding Gulf was at fault in navigation in not changing her course or speed; (2) that the owner of the Destroyer was at fault with respect to lights and absence of crew; (3) that the faults of both contributed to the collision and damage and (4) therefore an interlocutory decree must be passed in accordance with the usual maritime rule for a division of the damages. Counsel may submit the appropriate decree in due course.