**PACIFIC–ATLANTIC S. S. CO. v. THE TOWER GRANGE.**

**TOWER S. S. CO., Limited, v. PACIFIC–ATLANTIC S. S. CO.**

**TOWER S. S. CO., Limited, v. CURTIS BAY TOWING CO.**

No. 2970.

United States District Court, D. Maryland.

Oct. 8, 1948.

Theodore R. Dankmeyer of Baltimore, Md., and Eugene F. Gilligan, of New York City, for Pacific-Atlantic S.S. Co.

Frank B. Ober and William A. Grimes, both of Baltimore, Md., for Tower S.S. Co., Limited.

George W. P. Whip, of Baltimore, Md., for Curtis Bay Towing Co.

WILLIAM C. COLEMAN, District Judge.

This case involves a collision which occurred in Baltimore Harbor on October 10, 1947, between two steam vessels, the British Steamer Tower Grange and the American Steamship Elmer A. Sperry.

The Pacific-Atlantic Steamship Company, as bare boat charterer from the United States Government of the Elmer A. Sperry, a Liberty ship, libeled the Tower Grange whose owner, Tower Steamship Company, Ltd., has cross-libeled the Pacific-Atlantic Steamship Company, and has also filed a libel against the Curtis Bay Towing Company, the master of one of whose tugs was acting as pilot of the Elmer A. Sperry at the time of the collision. The Towing Company has impleaded the Pacific-Atlantic Steamship Company and its local agent, R. A. Nicol & Company, Inc., alleging that because of the contractual relationship between it, the Towing Company, and the Steamship Company, the responsibility, if any, of its tug master must be borne by the Steamship Company.

The material facts with respect to the collision as we find them from what we believe to be the weight of the credible evidence, may be summarized as follows, the two vessels involved, namely, the Tower Grange and the Elmer A. Sperry, being hereinafter referred to as the Grange and the Sperry:

The vessels were similar in size, the Grange being a single screw cargo steamer of 7068 gross tonnage, 430.9 feet in length, 56.2 feet beam, depth 35.2 feet; and the Sperry, a single screw Liberty cargo vessel of 7176 gross tonnage, 422.8 feet in length, 57 feet beam, depth 34.8 feet.

Shortly after mid-night on October 10, 1947, the Grange, with a full cargo of coal, left her anchorage in Baltimore Harbor and proceeded down the Fort McHenry Channel and thence into the Brewerton channel, keeping close to its southerly edge, bound down Chesapeake Bay and out to sea. Weather conditions were very favorable, the night being very clear with only a light northeast breeze and the tide almost flood. The Sperry, some time after mid-night, had undocked with a cargo at Sparrows Point which is lower down on the east side of Baltimore Harbor, and was proceeding, light, down the Sparrows Point channel into the Brewerton channel,

up which her master intended to take her to a dock at Locust Point.

The Sparrows Point channel runs from Sparrows Point, approximately due south, to a junction with the Brewerton channel, which runs northwest by west towards Baltimore and southeast by east towards Chesapeake Bay.

When the two vessels were about three quarters of a mile apart, measured in a direct line, that is, when the Sperry had proceeded to within approximately a third of a mile from the junction of Sparrows Point channel with the Brewerton channel, and the Grange had reached a point in the Brewerton channel about three-quarters of a mile from this junction, the Grange was given a slight starboard helm, and she blew a one blast signal indicating she intended to adhere to her favored position, being on the Sperry's starboard hand, and to make a port to port passing. The Sperry agreed to this by replying with a one blast signal and a hard right rudder. Up to this time the Sperry had been making about six knots and the Grange continued to proceed as she had been doing at a speed of about seven knots. The Sperry thereupon proceeded, without reducing her speed, to cut the corner of the junction of the two channels by changing her course to a more westerly direction, and thereby leaving to port the two channel buoys that mark the western edge of the junction. When the two vessels were within approximately a quarter of a mile of each other, the Sperry gave a three blast signal, indicating full speed astern. Thereupon, the Grange sounded a danger signal of four blasts, put her engines full astern, blew a three blast signal, and put her wheel hard to starboard. Only the green or starboard running light of the Sperry had been visible to the Grange, but the Sperry's range lights were closing fast, indicating that she intended to proceed up the Brewerton channel. Notwithstanding the fact that both vessels had their engines going full speed astern, they collided, port bow to port bow, almost head and head, causing substantial damage to both vessels. After the impact both vessels continued to their own starboard, the Sperry proceeding up the chan-

nel towards Baltimore, and the Grange grounding outside of the southerly edge of Brewerton channel, within about a minute after the collision and about a third of a mile to the westward of the junction of the two channels.

There is a very sharp conflict in a great deal of the testimony adduced on behalf of the two vessels as to just where the collision occurred, that is, whether to the north or to the south of the center of the Brewerton channel. The substance of the testimony on this factual controversy given on behalf of the Grange is to the effect that this vessel was proceeding on a straight course down the Brewerton channel, holding fast to her own starboard side, and that the Sperry, in endeavoring to make the turn of some 117° from the Sparrows Point channel into the Brewerton channel, erred in getting over too far and into the southerly or the Grange's side of the channel which, at the point of collision, was 600 feet wide.

In support of this claim, the testimony of the two witnesses for the Grange who, among all those who testified on behalf of that vessel, were in the best position to know and to appraise her true situation in relation to the other vessel, namely, the Grange's pilot and master, is to the effect that the Sperry's red light was never visible to the Grange until just before the two vessels struck.

On the other hand, the weight of the testimony given on behalf of the Sperry, including that of her pilot and her master, is to the effect that this vessel had completed her turn from one channel into the other, and had straightened out on her own starboard side just before the collision, but that for some inexplicable reason, the Grange, nevertheless, veered over from her own starboard side of the channel and struck the Sperry.

There is so much conflict, not only between opposing witnesses but also between witnesses for the same side, and so much of their testimony that is obviously unreliable that a detailed analysis of most of it would serve no useful purpose in an effort to determine the true cause of the collision. The master of the Sperry, whose

testimony was taken by deposition has, disagreed with a great deal of what other witnesses for the Sperry testified to, both by deposition and in open court, with respect to important factual issues. For example, the pilot of the Sperry testified that the green light of the Grange was seen when the Sperry entered the Brewerton channel; whereas the master of the Sperry, who was by the pilot's side, persisted that this light was not seen until just before the collision. The master of the Sperry was very voluble in his testimony, given by deposition, and on the whole what he said is not reliable, in spite of the fact that we would normally have the right to expect that testimony from one in such a responsible position would be accurate and helpful.

First, as to the manner in which the Sperry was navigated. We entertain no doubt that the weight of the credible evidence requires the conclusion that her navigation was faulty and contributed directly to the collision, for the following reasons. While it is not prohibited by any navigation rule or indicative per se of negligence for the Sperry to cut the channel buoys, as she did, at the junction of the Sparrows Point channel with the Brewerton channel, since the Sperry was light at the time and there was ample water (not less than 18 feet at low water) for her draught just outside of these buoys, nevertheless, the conclusion is inescapable that this manoeuvre, being in the night time, caused the Sperry to become less certain as to her exact position in relation to both the north side of the Brewerton channel and to the Grange that if she had adhered to the channel lines, and had endeavored to make the turn from one channel into the other by leaving the two buoys at the western junction close on her starboard hand. This is especially, true since these two buoys were unlighted.

Next, we are satisfied that the Sperry swung so wide in making the turn that she had never straightened up into the Brewerton channel before the collision; in other words, that she was obliquely across this channel, because we believe the testimony of the pilot of the Grange and supporting witnesses that the Sperry's red light was never visible to the Grange until just before the two vessels collided. This being true, it is apparent that the Sperry agreed to a port to port passing, by giving her one blast signal, at a time when she was not in a position to know with reasonable certainty that she could complete her part of same. Doubtless, her pilot gave a three blast signal when he found that the channel range lights were not closing as rapidly as expected because he must then, if not before, have recognized the Sperry's hazardous position since, without the range lights in line, his vessel could not safely proceed up the Brewerton channel. It may well be that when the Sperry cut the buoys, an increased drag on the vessel, due to the more shallow water, impeded somewhat her ability to make the turn within sufficient time to straighten up on her proper, that is, the northern side of the Brewerton channel, with range lights in line, and in a safe position with respect to making the port to port passing to which she had agreed. In addition, the fact that the Grange fetched up in the mud only about a minute after the collision, outside the southern line of the channel, very strongly indicates that the two vessels could not have come together to the north of the center line of the channel.

We thus conclude that as to the Sperry, her navigation was inexcusably faulty, and that such was undoubtedly a proximate cause of the collision. The Sperry was the burdened vessel. She should certainly have slackened speed, if not reversed her engines, before she entered Brewerton channel, which she should have done at the buoyed junction of the channels, and then have waited for the Grange to pass if she was close at hand, upon giving the appropriate signal or signals to the Grange. Pilot Rule VII provides: "When two steam vessels are approaching each other at right angles, or obliquely so as to involve risk of collision, other than when one steam vessel is overtaking another, the steam vessel which has the other on her own port side shall hold her course and speed; and the steam vessel which has the other on her own starboard side shall keep out of the way of the other by directing her course to starboard so as to cross the stern

of the other steam vessel, or, if necessary to do so, slacken her speed or stop or reverse." Also Article 19 of the Inland Rules, 33 U.S.C.A. § 204, provides: "When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other." Article 23, 33 U.S.C.A. § 208, provides that "Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse," and Article 25, 33 U.S.C.A. § 210, provides that "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel." We find that the navigation of the Sperry was not in conformity with any of these requirements. The Grange, after getting the Sperry's acquiescence in a port to port passing, had a right to assume that the Sperry would adhere to the Rules just set forth. Whether the Grange held to this assumption too long, is a question we will presently consider.

As respects the navigation of the Grange, it is urged upon us that she should be absolved from any liability because (1) she was the favored vessel, which is true; (2) it was reasonable and proper for her to have taken advantage of her favored position and to have called for a port to port passing, which is also true; and (3) that (1) and (2) being true, and there being no credible evidence that she had at any time improperly veered from her proper position, close to the south side of the channel, there was nothing else, therefore, that the rules of the road required her to do in order to avoid a collision.

However, with this we cannot agree because it ignores the fact that the Grange persisted in maintaining her course and speed, as we think too long, in the face of very imminent danger of collision with the Sperry. That is to say, it is admitted that the Grange continued to proceed at a speed of seven knots, after giving and receiving the one blast signal until she had reached a point within a quarter of a mile of the Sperry, whose then position she knew or should have known was not in conformity

with a port to port passing, but in fact fraught with real danger of collision, since the Sperry was still showing only her green or starboard light, indicating that she was still headed at least partially athwart the channel and in a direction quite contrary to that which it was necessary for her to assume in order to assure a safe passing. Furthermore, the Grange did not, even though faced with this situation, blow a danger signal until after the Sperry had blown one.

■ Under these circumstances we are of the opinion that the Grange failed to meet the requirements of the special circumstance rule (Article 27, 33 U.S.C.A. § 212) which provides that "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

■ It is claimed on behalf of the Grange that this rule did not become applicable in the present case until the Sperry had sounded her three blast whistle, because up to that time there was nothing to indicate to the Grange that there was any likelihood of *immediate* danger if she continued to hold her course and speed. However, with this we cannot agree, for the reasons just stated. As was said in *Postal S.S. Corp. v. El Isleo*, 308 U. S. 378, at page 387, 60 S.Ct. 332, at page 336, 84 L.Ed. 335: "The plain purpose of the Inspectors' Rules is to minimize the danger of collision. The so-called privileged vessel has no absolute right to keep her course and speed regardless of the danger involved in that action. Her right to maintain her privilege ends when there is danger of collision and in the presence of that danger both vessels must be 'stopped and backed if necessary, until signals for passing with safety are made and understood.' "

Counsel for the Grange argue that The Ambridge (The Willsolo), 4 Cir., 42 F.2d 971, a decision of the Court of Appeals for this Circuit, is in direct conflict with the conclusion which we have here reached. However, we are satisfied that such is not the case, when the facts involved in that

decision are fully understood and compared with the facts now before us.

It is true that in the Ambridge some of the facts were rather similar—signal given and accepted for a port to port passing by vessels of a size comparable to the Sperry and the Grange, in a channel akin in breadth to the Brewerton channel; and the favored vessel maintaining her course and speed until the other vessel gave evidence of her inability to complete the passing by giving three blasts, indicating full speed astern. However, there were at least three, if not other, important factual differences in that case: (1) The collision occurred in daylight, with good visibility; (2) the three blasts of the burdened vessel were not given until two minutes after she had actually put her engines full speed astern; and (3) the favored vessel had dropped her starboard anchor before the collision in a final effort to prevent her sheer towards the other vessel which had been caused by putting her own engines full speed astern. Clearly these are very material factual differences, proving that since no two collisions ever involve the same set of circumstances, all of the facts in each particular case must be most meticulously examined and analyzed.

 It is further urged on behalf of the Grange that to hold there was mutuality of fault directly contributing to the collision, is to go counter to the so called major and minor fault doctrine firmly established by the Supreme Court and applied in a wealth of decisions. This doctrine is that where the fault of one vessel is obvious and inexcusable, the evidence to establish fault on the part of another vessel must be clear and convincing in order to make a case for apportionment. The City of New York, 147 U. S. 72, 13 S.Ct. 211, 37 L.Ed. 84; The Oregon, 158 U. S. 186, 15 S.Ct. 804, 39 L.Ed. 943; The Victory and Plymothian, 168 U. S. 410, 18 S.Ct. 149, 42 L.Ed. 519; The Ambridge, supra; Harbor Oil Transport Co. of Conn. v. The Plattsburgh Socony, 2 Cir., 151 F.2d 708; The Cyrene, 4 Cir., 85 F.2d 935; The Bright, 4 Cir., 124 F.2d 45.

We believe that the weight of the credible evidence is clear and convincing that the fault in the navigation of the Grange, while not as great as that of the Sperry, was nevertheless of a serious character and amply sufficient to require a division of responsibility for the collision and consequent damage. Both the pilot and master of the Grange testified that the Sperry's red light was never visible to them until just before the collision. This being true, the Grange should not have waited, as she did, for the Sperry to reverse her engines before at least reducing her own speed, if not in fact reversing her own engines and giving the danger signal. Thus, it is not sufficient to say that since it was the duty of the Sperry to keep out of the Grange's way, and that since the Sperry was in the better position to determine whether she could do so, the Grange should not be blamed for failing to realize danger more quickly than a vessel in the best position to comprehend the effect of her own manoeuvres. The testimony of the pilot of the Grange clearly refutes this argument. He was asked "So, seeing the vessel headed to your side of the channel, at an angle across the channel, *you did nothing until a minute before this collision, on the chance that this offending vessel would turn off to clear you?*" (Emphasis inserted.) To this he replied: "That is right." He knew that he was restricted as to his freedom to manoeuvre by the shallow water outside the channel, on his starboard hand. This is a further reason why he should have exercised greater caution in his approach towards the Sperry. Obviously, he did not want to run a chance of forcing the Grange aground outside the channel. But in taking this precaution on his starboard hand, he failed to use sufficient caution with respect to the on-coming Sperry.

There remains to be considered whether there is any liability on the part of the Curtis Bay Towing Company, the libel against that company by the Tower Steamship Company, owner of the Grange, being based on the theory that since, at the time of the collision, the Sperry was under the command of one of the Towing Company's tug captains acting as harbor pilot, the latter company as agent or employee of the Sperry's owner, cannot escape liability to the owner of the Grange.

 The Towing Company denies liability on the ground that by the express terms of a formal, written towing contract be-

tween it and the Sperry's owner, it is exempt from liability for any damage resulting from the conduct of any of its tug boat captains or licensed pilots while furnishing pilotage service to the Sperry's owner. The Towing Company relies upon Sun Oil Company v. Dalzell Towing Company, 287 U. S. 291, 53 S.Ct. 135, 77 L.Ed. 311, in which the validity of a similar provision in a towage contract was upheld. See also, Moran Towing & Transportation Company, Inc., v. Navigazione Libera Triestina, S.A., 2 Cir., 92 F.2d 37; The H. C. Jefferson, D.C., 69 F.Supp. 650; and The St. Francis, D.C., 72 F.Supp. 50. However, this does not mean that the Towing Company may not still be liable to a third party entirely foreign to the contract for pilotage services, as was the Grange's owner in the present case. Since we find the Sperry to be liable equally with the Grange for the damage caused by the collision between the two vessels, the Towing Company must, to like extent, be held secondarily liable to the Grange, on the doctrine of principal and agent.

A decree will be signed in accordance with this opinion.