**BOSTON METALS CO.**
v.
**THE WINDING GULF et al.**
**THE ST. FRANCIS.**
No. 6637.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 11, 1953.
Decided Jan. 4, 1954.

John H. Skeen, Jr., Baltimore, Md. (William A. Skeen and Eugene M. Feinblatt, Baltimore, Md., on brief), for appellant.

Charles S. Bolster, Boston, Mass. (Theodore R. Dankmeyer, Baltimore, Md., Seymour P. Edgerton, Bingham, Dana & Gould, Boston, Mass., and Niles, Barton, Yost & Dankmeyer, Baltimore, Md., on brief), for appellees.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

A collision on the night of July 13, 1945 at sea outside the southernmost end of Buzzards Bay, Massachusetts, between the steam collier Winding Gulf and an obsolete destroyer which formerly belonged to the United States and was then in tow of the tug Peter Moran, caused damages to the ship and the total

loss of the destroyer. On November 14, 1945 Boston Iron and Metal Company, a Maryland corporation which owned the destroyer, filed a libel against the ship and her owners in the District Court of Maryland. Thereupon Massachusetts Trustees of Eastern Gas and Fuel Associates, a voluntary association organized under the laws of Massachusetts, filed a claim to the ship as owners thereof and also filed a cross libel in personam against Boston Metals.

The District Judge held upon the trial of the case that the ship was in fault in not changing her course or speed, and that the owner of the destroyer was at fault in respect to lights and absence of crew on the destroyer, and that both faults contributed to the collision, and accordingly entered an interlocutory decree for division of damages. See the opinion of Judge Chesnut in The St. Francis, D.C., 72 F.Supp. 50.[1] The judge subsequently found that Boston Metals had suffered damages in the sum of $15,000 for the loss of the destroyer and that Massachusetts Trustees had suffered damages for injury to the ship in the sum of $18,657.04, and entered final judgment in favor of Massachusetts Trustees in the sum of $1828.52 with interest. See Boston Iron & Metals Co. v. S. S. Winding Gulf, D.C., 85 F.Supp. 806.

Boston Metals was held liable for the faults of the destroyer although she was a dead ship unmanned and without motive power and was being towed by the tug Peter Moran when the collision took place. Ordinarily the faults of navigation of the tow under such circumstances could not be imputed to the owners of the tow but only to the tug. Sturgis v. Boyer, 24 How. 110, 16 L.Ed. 591; The Eugene F. Moran, 212 U.S. 466, 29 S.Ct. 339, 53 L.Ed. 600; The John D. Rockerfeller, 4 Cir., 272 F. 67. In this case, however, there was a special form of contract between Boston

Metals, the owner of the destroyer, and the Foundation Maritime, Ltd., a Canadian corporation which agreed to supply the tug for the towage of the destroyer and an accompanying ship from Sydney, Nova Scotia, to Baltimore, Maryland, for $11,000, with the understanding that the services of the towing company would be supplied in accordance with the Standard Towing Conditions attached to and made a part of the contract as follows:

"2. The services will be supplied upon the condition that all towing, moving, shifting, docking, undocking or other handling of a vessel or craft of any character by a tug or tugs owned or employed by the Tug Company is done at the sole risk of such vessel or craft and of the owners, charterers or operators thereof, and that the Master and crew of such tug or tugs used in the said services become the servants of and identified with such vessel or craft and their owners, and that the Tug Company only undertakes to provide motive power.

"3. The Tug Company will not be responsible for the acts or defaults of the Master, or crew of such tug or tugs, or any of their servants or agents or else whosoever, nor for any damages, injuries, losses or delays from whatsoever cause arising that may occur either to such vessel or craft, or property or persons on board thereof, or to any other ship or vessel or property of any kind whether fixed or movable and the Company shall be held harmless and indemnified by the Hirer against all such damages, injuries, losses and delays, and against all claims in respect thereof."

The District Judge held that these conditions of the contract legally resulted in making the faults with respect to

---

1. The destroyer, originally called the U. S. S. Bancroft, was one of fifty destroyers transferred to the British early in World War II, and was named the St. Francis and operated by the Canadian Government.

lights and absence of crew on the destroyer directly attributable to Boston Metals, her owner, and that these faults might be ascertained in the pending suit without being first litigated in a suit by the Winding Gulf against the tug, because they constituted faults of the master of the tug who, by the terms of the agreement, became in this respect the servant of Boston Metals.

The tug, Peter Moran, was not brought into the instant suit because of lack of jurisdiction in the Maryland court, but subsequently the Massachusetts Trustees filed a libel for damages to the collier against the tug in the Southern District of New York. The New York suit was still pending when the decision in the instant case was filed, but has since been decided by Judge Coxe in Adams v. The Peter Moran, D.C. S.D.N.Y., 94 F.Supp. 520. The case was heard upon the deposition of the master of the tug taken in the Maryland suit and upon a stipulation that the facts were as found by Judge Chesnut in his opinion; and the judge held upon the record, as Judge Chesnut had previously found, that both the ship and the tug were at fault and that the faults of both contributed to the collision. He also held that the provisions of the towing contract making the master of the tug the servant of the owner of the tow merely served to fix the relationship between the tug and the Boston Metals, and could not affect the liability of the tug or the liability of the tow, as independent vessels, each one liable to the collier for its own fault. He therefore entered a decree dividing the damages equally among all three vessels, since all were equally at fault, but providing that the collier should not receive more than two-thirds of her damages, taking into account the amount collected from Boston Metals under the Maryland decree.

Boston Metals contends that the great preponderance of the evidence shows that the collision was due solely to bad navigation on the part of the Winding Gulf without any fault on the part of the tug; and that even if the tug was negligent in respect to lights or the absence of a crew on the tow, these faults did not contribute to the accident because the navigators of Winding Gulf had ample warning of the presence of the flotilla by the whistles and the towing lights of the tug.

We do not agree. The vessels approached one another at night in a fog which had set in during the previous hour. The course and direction of the tug was southwest by west while the Winding Gulf was proceeding east by one-half north. The steamer was displaying the usual lights and the tug, in addition to other lights, was showing three lights vertically arranged indicating a tow but not the length thereof. There were two destroyers in tow of which the first had one white light in the proper place, and the second, the St. Francis, had two lights indicating that it was the last vessel in the flotilla. The steamer and the tug each sounded fog signals which were heard by the other and each saw the other's light when one-half mile apart. When they came abreast they were one-quarter of a mile apart. The length of the flotilla was three-fifths of a mile and although the master of the Winding Gulf was aware of the fact that he was approaching a flotilla and although he was not able to determine the length of the tow on account of defective lights on the destroyers, he negligently assumed that it was not more than one-fourth of a mile long and did not make sufficient change of course to clear it, so that the stem of the steamer struck the starboard aft side of the St. Francis. The record supports the findings of Judge Chesnut that both vessels were at fault, for the reasons set out and discussed in his opinion; and we conclude, as did Judge Coxe in the New York case, that both vessels were at fault and that the damages should be divided.

The major attack on this appeal is directed against the holding of the District Judge that the faults of the tug are attributable to Boston Metals because of the inclusion of the towing

conditions in the agreement above set out. Preliminarily, the libellant questions the existence of the contract as set out in the form of a letter from the towing company to Boston Metals; but the letter was produced and identified by the libellant as the governing towage contract and was offered in evidence by the respondent. The libellant objected to its admissibility on the ground that it was a private contract between Boston Metals and the towing company; that its validity was doubtful; and that it was irrelevant to the controversy relating to the liability of the parties to the collision. These objections, however, were overruled and the document was received in evidence. There can be no doubt that it was recognized by the parties to the litigation as the authentic agreement under which the towing operation was conducted.

We come then to the question whether for the purposes of this case the contract changed the settled rule that a tug is solely responsible for the fault of an inert tow of which it has entire charge. The case is governed in our opinion by the decision in Sun Oil Co. v. Dalzell Towing Co., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311, wherein the court sustained a towing contract between a shipowner and a towing company which was designed to govern transactions between them. It provided that when the captain of any tug engaged in the services of towing a vessel, using its own propelling power, goes on board the vessel he becomes the servant of the owners in respect to the giving of orders to any of the tugs engaged and in respect to the handling of the vessel; and neither the tugs nor their owners should be liable for any damage resulting therefrom in a towing service. Under this contract three tugs undertook to dock a tanker which was using her own power, and the captain of one of them went aboard the ship and acted as pilot, and during the operation the ship ran aground. The court found that the tugs were not at fault in the grounding, and held also that the shipowner could not recover for the negligence of the tug captain because under the agreement the captain, while on board and acting as pilot, was the servant of the shipowner and the towing company was not responsible for any act of omission on his part. It was said that the validity of the contract could not be reasonably doubted since the towing company was not a common carrier, the parties were on an equal footing and there was no rule of public policy which denied the effect of the intention expressed in the agreement. The provision that the tug captain while on the ship should be the servant of her owner was held to be an application of the well established rule that if one puts his employee at the disposal of another, such employee is deemed to be the employee of the latter and not of the former; and it was said that it would be unconscionable for the ship owner, upon the occurrence of a mishap, to repudiate the agreement upon which it obtained the service.

Upon the authority of this case the validity of an analogous provision of a towing contract, exempting the tug from liability for damages under certain circumstances, was upheld by the Sixth Circuit in Great Lakes Towing Co. v. Bethlehem Transportation Corp., 6 Cir., 65 F.2d 543, and Great Lakes Towing Co. v. American S.S. Co., 6 Cir., 165 F.2d 368. A clause in the agreement declared that when a vessel was towed stern first by one tug the service would be under the control of the master of the vessel and the tug would not be liable for any damages sustained by a collision of a tow with any other craft or object. The exemption of the tug was not given effect in these cases because the master of the tug acted upon his own initiative and did not in fact place his vessel under the directions of the master of the ship. Nevertheless it was held, in accord with Sun Oil Co. v. Dalzell Towing Co., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311, that had the master of the tug acted as contemplated in the contract, no liability on the part of the tug would have arisen because in such event the master and

crew of the tug would have became *pro tempore* servants of the tow.

The above decisions were concerned only with the effect of the towing contract as between the parties thereto, and the clause was enforced, when its conditions were met, by relieving the tug owner and tug from liability for damages for injury to the tow. The effect of the contract upon the rights of third parties to recover damages from either or both of the contracting parties was not involved. Such a right is asserted in the instant case in the claim of the owner of the Winding Gulf to recover from the owner of the tow the damages caused by the negligent operation of the tug.

The tug is not before us since she refused to submit to the jurisdiction of the court and come into the case. She was, however, held liable in the New York suit; and in other cases the liability of the tug to third parties for negligent operation has been sustained notwithstanding the presence of a pilotage clause in the towage contract. See Robins Drydock & Repair Co. v. Navigazione Libera Triestina, 154 N.Y.Misc. 788, 279 N.Y.S. 257, affirmed 261 N.Y. 455, 185 N.E. 698; Moran Towing & Transportation Co. v. Navigazione Libera Triestina, 2 Cir., 92 F.2d 37. We are not called upon to decide whether the owner of a tug or the tug itself, which is operating under a contract containing the standard towing conditions, may ever escape liability to a third party for injuries caused by its negligence. We have merely to determine whether liability of the owner of a tow to third parties may be based on such an agreement. In Moran Towing & Transportation Co. v. Navigazione Libera Triestina, supra, such a contract was enforced in a suit against the owner of the tow by the owner of the tug which had been compelled to pay damages to an injured third party; and we see no reason why it should not be given effect in a suit by an injured third party against the owner of the tow. We know of no principle of law which forbids a person who employs another to perform an undertaking for him, in which the other has full control of the operation, from agreeing that he will assume the burdens which an independent contractor would ordinarily bear. Such a contract of indemnity is not unusual. Whether the contract in the instant case was made because the voyage from Sydney to Baltimore was deemed unusually hazardous, or because the owner of the tow was given a lower rate, is immaterial. The contract was deliberately assumed and it would be unconscionable for the owner of the tow to repudiate it after the accident occurred. There is no difficulty in the assertion of the right by the ship in this case without first establishing the negligence of the tug in a separate suit. The libel was filed by the owner of the tow who had agreed to take the risk of the enterprise and pay any damages that might be incurred, and as was said by Judge Learned Hand in the Kookaburra, 2 Cir., 69 F.2d 71, 73, "the admiralty, whose procedure is especially plastic, can skip the by-ways and head direct for the goal."

Affirmed.