**GLEN SOUTHERN SHIPPING CORPORATION, The Home Insurance Company, a corporation, Lloyd M. Hilton and Ruth Hilton, his wife, as their interests may appear, Libellants,**

v.

**NORFOLK TOWING CORPORATION, in personam, and the Oil Screw Tug LINDA, her engines, tackle, apparel, furniture, etc., in rem, Respondents.**

No. 7660.

United States District Court
E. D. Virginia, Norfolk Division.

Feb. 24, 1955.

148

Jett, Sykes & Howell, R. Arthur Jett and Henry E. Howell, Jr., Norfolk, Va., for libellants.

John W. Oast, Jr., David H. Batchelder, Jr., Norfolk, Va., for respondents.

HOFFMAN, District Judge.

This action in Admiralty is instituted by Glen Southern Shipping Corporation, The Home Insurance Company, Lloyd M. Hilton and his wife, Ruth Hilton, against Norfolk Towing Corporation, in personam, and the tug Linda, her engines, etc., in rem, in which it is alleged, and the evidence so indicates, that Glen Southern is engaged in the marine transportation business and, for the purpose of this proceeding, was the owner of two "rake-end" wooden barges called the Hope and Whiteport; that The Home Insurance Company operates a marine insurance business and issued policies covering the losses and damage to the Hope and Whiteport; that Lloyd M. Hilton was the master of the barge Hope at the time involved herein, and that his wife, Ruth Hilton, was the cook on said barge. The tug Linda was, at the time stated, an oil screw tug (wood construction) equipped with a diesel engine, and was owned and operated by the respondent, Norfolk Towing Corporation. The libel alleges unseaworthiness of the Linda as to the tug and appurtenant equipment, as well as incompetency of its master and crew, together with general allegations of negligence on the part of Norfolk Towing Corporation, its servants and employees. The claimant-respondent, Norfolk Towing Corporation, answered by admitting the more formal allegations of the libel but denying the unseaworthy condition of the Linda and the averments of negligence. The answer also asserts the terms of a written contract between respondent and libellant, Glen Southern, executed August 25, 1953, and further contends that the barge Hope was unseaworthy. An amended answer was thereafter filed in which respondent, Norfolk Towing Corporation, while denying any liability, asserts that any damages to the Hope or Whiteport were incurred with-

out the privity or knowledge of the Norfolk Towing Corporation, and hence the respondent is entitled to limit its liability to the value of its interest in the tug Linda.

The trial of this case required five days and the Court is without the benefit of the transcript of the evidence, excepting, however, the depositions introduced and the stipulations filed.

Certain preliminary facts are pertinent in leading up to the particular date of the alleged losses and damages. As the date of the loss and damage was January 22, 1954, it is well to examine the circumstances for approximately one year prior thereto in order to determine the seaworthiness of the tug Linda (owned by respondent) and the barges Hope and Whiteport (owned by libellant, Glen Southern). Except as hereinafter indicated, whenever the libellant is referred to in this opinion, it shall mean Glen Southern Shipping Corporation.

It appears that in January, 1953, libellant entered into a *verbal* contract with respondent wherein respondent agreed to tow libellant's barges, in furtherance of libellant's contract with Norris Grain Company, said barges to contain grain shipped from various points in eastern North Carolina and Virginia to Baltimore. Such trips involved traversing the Chesapeake Bay, the lower portion of which admittedly becomes "very rough" during heavy weather conditions. The two barges involved in this controversy, together with the barge Hadley, were customarily used by libellant, and respondent used the tug Linda and the tug Elizabeth II in the performance of its portion of the contract.

Having operated for approximately eight months under a verbal arrangement without any essential differences, a written contract was executed on August 25, 1953. The circumstances surrounding the execution of this written contract were substantially as hereinafter stated. On a visit to respondent's office by one W. T. Luthi, manager of libellant corporation, he and Capt. W. B. White, manager and principal officer of

respondent corporation, decided to put into written form the details of their prior verbal contract. Luthi requested White to make available some stationery upon which he, Luthi, could type the contract. White handed Luthi several sheets of Norfolk Towing Corporation's letterheads and Luthi prepared the contract. The original contract is in evidence as Respondent's Ex. No. 9, and a photostatic copy is attached to respondent's answer. *Printed* on the letterhead approximately two inches below the name and address of respondent (the space obviously having been left for the purpose of inserting the name and address of the party to whom the letter was being sent) appears the following language:

"All agreements contingent upon strikes, accidents or other causes beyond our control, and the pilotage clause appearing in our published tariff. Not responsible for wind, weather, errors of navigation or Acts of God".

Luthi did not testify, but White admits that no discussion took place with respect to the quoted printed matter above stated. In explanation of the clause in controversy, White testified that the words "not responsible for wind" and "errors of navigation" mean "just what it says" and, in illustration, White refers to deviation of navigational aids such as buoys floating off course, misplaced lights, misplaced ranges, etc. White also insists that this clause exonerates the respondents for negligent acts of the master of the tug. As the Court will hereafter point out, the respondent's contention that it can now "hide behind the contract" is without merit.

Approximately one month prior to the alleged occurrence, the tug Linda sustained some ice damage in the Currituck Sound and North Landing River, in eastern North Carolina. There is evidence that either this or prior damage to the hull caused the vessel to leak rather extensively. Captain White, the principal officer of the respondent corporation, knew of the leaking condition of the hull, but made no personal inspection of

the tug following the ice damage. He did, however, cause the tug to be taken to Colonna's Shipyard, at Norfolk, for the purpose of repairs. No representative of the Shipyard testified as to the nature of these repairs. White admitted his knowledge of some leak in the stern of the tug, particularly when she was running light. For the period of 3½ months prior to January 22, 1954, White made only one trip on the Linda (to New Bern, North Carolina) and he does not recall whether this trip was prior or subsequent to the ice damage. Subsequent to January 22, 1954, it was ascertained that the leak was in the top of the sleeve leading to the rudder and, after the removal of concrete blocks hereinafter referred to, the leak was repaired. In addition to the ice damage, there was evidence that the Linda went aground in North Carolina at about the same time with some slight damage to the engine but no appreciable damage to the hull.

During the early part of 1953 respondent caused to be removed from the Linda a 240 H. P. Fairbanks-Morse engine, having an estimated weight of from 10 to 20 tons,[1] and, in lieu thereof, installed two General Motors 6-71 Diesel engines, each engine being rated at 165 H. P. on approximately 1550 R. P. M. The aggregate weight of the newly installed engine room plant was estimated by one witness at three tons, and Capt. White, while not advised of the exact tonnage, admitted knowledge of the fact that the combined weight of the newly installed engines was considerably less than the removed Fairbanks-Morse engine plant.[2] To correct this obvious defect, White caused two 750 gallon oil tanks to be placed on each side of the new engines, and loaded the hull of the vessel, forward, amidship and aft, with a large number of concrete blocks, each weighing from 90 to 100 pounds.[3] In the stern of the vessel the concrete blocks were ultimately removed and the leak in the sleeve leading to the rudder was ascertained.[4] Unfortunately this corrective procedure occurred after the damage, which is the subject matter of this inquiry, took place.

The effect of the ballast in the engine room is relevant—not only as to the difficulty in locating the leak around the "stuffing box", but also to determine the results in the operation of the tug. The Linda was designed for an 18 inch freeboard, whereas the freeboard as of February 13-14, 1954 (the date of survey), was 30 inches measured at the lowest point. Capt. Anderson, an expert introduced on behalf of respondent, did not testify as to the existing freeboard, although respondent's deposition Ex. No. 16 indicates the "average" freeboard to be 20 inches. The place in which this statement is made in the exhibit lends force to the belief that this information was obtained from an official document in existence prior to the change of engines. Capt. White, while not specific in his estimation of the freeboard differential, testified that the freeboard with the old Fairbanks-Morse engine plant was approximately the same as the freeboard under conditions existing at the time of the damages sustained herein. It is fundamental that the natural effect of a greater freeboard will cause excessive rolling of the vessel and, in addition, any ballast used to offset the loss of weight should not be distributed throughout the vessel, but should be under or near amidships in order to avoid the "bending" of the vessel which has a marked tendency to open the seams. The use of steel, cast

---

1. Capt. White estimated the tonnage of the Fairbanks-Morse engine plant at from 10 to 12 tons. William Dalgarno, a witness for libellant, estimated same to be 15 to 20 tons.

2. While Capt. White testified that he didn't know the weight of the present en-

gine room plant, he further stated that "it was not important to know".

3. The weight of each block is taken from White's testimony. Dalgarno estimated the weight to be 40 pounds per block.

4. White testified that, on February 2, 1954 (prior to survey), about 7½ tons of cement ballast were removed from the fore and aft peaks of the Linda.

iron pigs, or chains are preferred to concrete blocks. This poor distribution of ballast with the resultant excessive rolling of the vessel quite naturally produces a strain upon any towing hawser.

Before commenting further upon the unseaworthy condition of the Linda, it is well to note the testimony of respondent's expert marine surveyor, Capt. Anderson. Without in any manner detracting from the qualifications of this witness, it is significant to note that, at the time of the maneuver of the Linda in the Elizabeth River on February 13, 1954, Anderson made the following comment: (Anderson Dep. p. 45)

"Q. Did you make any inspection to see what, if any, ballast was in the hull of the tug? A. To my knowledge, there was no ballast.

"Q. To your knowledge there was no cinder block or chain, or anything of that sort? A. I don't recall seeing any, sir. There may have been some which was partly covered by stores, such as rope, or canvas, or tools."

As all witnesses, including Capt. White, admitted the existence of concrete blocks at the time of the survey, the Court must, of necessity, give but little weight to Anderson's testimony as to the seaworthiness of the Linda. White did state that, at the time the leak in the top of the sleeve leading to the rudder was discovered, approximately one-half of the cinder blocks were removed and some were moved forward to equalize the draft. The removed blocks had not been replaced as of the date of trial. Obviously, at the time of the survey, many of the concrete blocks were in the hull and, if Anderson could not see what was in plain view, it follows that his survey of the Linda was rather incomplete.

While it is perhaps sufficient for libellant to rest its case alleging unseaworthiness of the Linda on the foregoing facts, the proof of unseaworthiness does not stop there. While this Court is mindful of the fact that all wooden vessels are prone to leak from time to time, this condition is generally remedied by pumps

sufficiently adequate to keep the water in the bilge at a minimum. According to respondent's expert, Anderson, a vessel such as the Linda should have two *operating* pumps and that he, Anderson, would not pass the vessel for inspection unless this condition existed. At the time of survey, Anderson found two pumps on the tug, both of which he described as "main pumps"—one pump consisted of a 1½ inch bilge suction pump driven off a "Petter" Diesel engine, 5 H. P. (auxiliary engine) and through a clutch and belt system driving one "Kato-Light" 2 K. W. generator—the other pump was a Jaeger, electrically operated bilge pump, with a two-inch suction. Anderson testified that he would not have passed the Linda as seaworthy if the main generator was not aboard and in working condition, as it would be unsafe to rely upon the batteries to supply the needed power. Respondent endeavors to avoid liability as to the defective condition of the pumps by relying upon White's statement that he made no inspection of the tug unless defects were reported by the Captain and, in this case, Capt. Mason did not ever mention the condition of the pumps, the auxiliary engine, or generator. Likewise, White never bothered to inquire of his Captain as to any needed repairs or replacements. This is a rather strange assumption of confidence by respondent in the ability of the Master of the tug, particularly in light of the fact that respondent had hired and fired four Masters of the tug during the year preceding the occurrence here involved. Capt. White admits that, when the Linda left Norfolk en route to Baltimore on the ill-fated voyage, the generator off the main engine was left ashore and that a 2 K. W. "Jitter Bug" was aboard. The crew of the Linda leaving Norfolk consisted of Capt. W. C. Mason, Engineer Horace Conway, Deckhand Ellis O. Gibbs, and a cook. Upon arrival at Baltimore, the cook left the vessel, but Mason did not notify Capt. White and no effort was made to secure a replacement. The three-man crew on the return trip from Baltimore to Norfolk

all testified that the main generator was off; that the auxiliary generator on the tug was ineffective due to leaks in the radiator to the engine which caused the engine to become hot, thereby requiring a cut-off at frequent intervals; that the lack of power adversely affected the ship's communication system; that one pump was definitely not working, and the power for the other was limited; that the engines could not be operated effectively for longer continuous periods than one hour due to the condition of the pumps; and that the Linda was leaking excessively during the storm on the return trip from Baltimore to Norfolk. After the tug made port, Capt. White's son, Linwood B. White, stated that the vessel was leaking excessively and pumps were not working due to waste material in the foot valves and, while it required approximately one hour to locate the difficulty, the matter could have been corrected in five minutes had the defect been known. This witness had no prior experience as an Engineer and his testimony is contradicted by Conway, the tug's Engineer, who stated that his inspection made after the storm revealed the bushes in the sleeve housing of the auxiliary pump to be worn, thus permitting air and rendering the pump ineffective, and that the bearing was worn out in the electric pump. Conway also testified that the fan on the radiator of the auxiliary engine had worked "loose", but it is not believed that these conflicts in the testimony are particularly essential to a determination of this case.

Without discussing, for the moment, libellant's other allegations of unseaworthiness, it is appropriate to give the details of the voyage in question. En route to Baltimore the barge Hadley was in tow of the Linda, and the trip was not marked by any adverse circumstances worthy of comment. On the return trip to Norfolk, the Linda took the barges Hope and Whiteport in tow. The barges were light. The towing hawser was furnished by the tug; it being the conventional six inch manila rope. The Hope was the lead barge and was manned

by libellant, Lloyd M. Hilton, and his wife, Ruth Hilton. The barge Whiteport was astern and was manned by one Vernon Hopkins, a youth twenty years of age. At the commencement of the trip the hawser line between the tug and the Hope was let out to a point approximately 180 feet in length. The flotilla left Baltimore around 7 A. M. on January 21, 1954. At 11 A. M. it was necessary to anchor off the channel outside of Baltimore due to the fog. Approximately one hour later Mason received a favorable weather report and proceeded under way. At 6 P. M. and again at 12 P. M. Mason contends that he endeavored to secure weather reports but was unable to do so because of lack of power, although he admits making contact with the Coast Guard station at New York which, he says, probably had a higher frequency. As there is no showing that particularly adverse weather reports were available at these hours, this is immaterial. Around midnight the deckhand, Gibbs, took the wheel and remained on duty until 6 A. M. Presumably Mason retired as he did not testify as to adverse weather conditions until the early hours of January 22nd. The two barge Captains, Hilton and Hopkins, were awakened by the rolling and shaking of the barges at 1 A. M. and, upon instructions from Hilton, Hopkins lengthened the couplings to the eye, thereby increasing the distance between the Hope and Whiteport. Obviously the seas became increasingly heavy as the tow proceeded southerly in the Chesapeake Bay. At 4 A. M. Hopkins again awakened and noted that the rolling had increased. He remained awake thereafter. At 5 A. M. Hilton noted that the seas were "choppy" and the wind was northeast. Conway, the engineer, came on the tug's deck at 5:30 A. M., for the purpose of starting the generator to enable Mason to get the 6 A. M. weather report. According to his testimony, the wind was then blowing 15–20 miles per hour, and at 7 A. M., the wind started blowing northeast. At 6 A. M. Capt. Mason received "small craft warnings" from the Marine Operator at

Norfolk, more adequately described in Respondent's Ex. 10, as follows:

"Small craft warnings indicated at 4 A. M. today south of Block Island to Cape Hatteras including Delaware and Chesapeake Bays for fresh to strong northeasterly winds, becoming southerly extreme south portion today and shifting to northwest over south portion tonight".

Mason described a "fresh wind" as 18–20 miles per hour, and a "strong wind" as 25–30 miles per hour. Lieutenant Cseh, Chief of Communications Section of the Coast Guard, referred to "strong wind" as between 35 and 40 miles per hour.

While the evidence does not affirmatively show at what time the hawser line was lengthened between the Linda and the Hope, it is apparent that such was done as, at 8:30 A. M., the tow line was estimated to be from 500 to 700 feet in length.

Between 6 A. M. and 8:30 A. M., Mason did not keep his radio on and, while the wind was increasing and the weather "didn't look too good", he referred to it as a "gradual matter". As the tug was not equipped with a barometer or clock, Mason did not know the exact time, nor was he particularly alarmed by the 6 A. M. report.[5] He contends that he received the "northeast storm warnings" at 8:30 A. M., but he is obviously in error as to time, as Lieutenant Cseh testified that the Marine Operator at Norfolk first received this report at 8:58 A. M. This report is as follows (Respondent's Ex. 10):

"Northeast storm warnings ordered displayed 8 A. M., E. S. T., today, Block Island to Hatteras including inland waters. Increasing Northeast winds becoming strong to gale force this afternoon and tonight backing to north to northwest late tonight and Saturday. Snow and poor visibility Virginia Capes north-

ward and rain south of Virginia Capes".

Whatever may have been the time of the receipt of this message, Mason then endeavored to change his course and enter the York River by veering westwardly. This resulted in the starboard side of the Linda becoming exposed to the waves, and she proceeded to take on too much water. Fearing for the safety of the tug and, the Court suspicions, for the safety of its captain, Mason again changed his course and headed in the direction of Thimble Shoal Light. In the interim, Conway had reported that the tug's pumps were not working and that the water in the bilge had reached a depth of 15 inches.

Approximately 45 minutes to one hour after the change of course, the hawser parted at a point approximately 25 feet from the bridle, nearest the Hope, and the barges were adrift. The tug was then about 8 miles north of Thimble Shoal Light and, if the line had not parted, it would have required from 1¾ to 2 hours to reach Old Point Harbor, a point of safety. Mason contends that he signaled the Hope to anchor, but Hilton denies the receipt of such message. Mason did not consider that, in leaving the barges, it was any act of abandonment as he thought the barges would be safe at anchor. He proceeded to telephone the Coast Guard and then reached Capt. White. The Linda arrived at Old Point at 11:30 A. M., and continued on to Sewell's Point (Norfolk) where Mason again talked to White and received information that the Coast Guard had sent the Jonquil to the barges. Mason indicated that, in his opinion, a sound commercial tug could have gone out and made fast to the tow at that time, but he states that the Linda, in her then condition, could not have accomplished this feat.

One hour or more before the hawser line parted Captain Hilton on the barge Hope and Captain Hopkins on the White-

5. The absence of a barometer was admitted. Capt. White testified that, with radio and ship-to-shore telephone, a barometer is valueless. He concedes that a barometer might be of some assistance to a mariner.

port ran up a small white flag indicating that they wanted to go to harbor as, according to Hilton, Thimble Shoal is the roughest part of the Bay and the wind had increased to approximately 30 miles per hour. The flotilla was then five to six miles south of Wolf Trap and perhaps could have found safe harbor if the tug had been sufficiently seaworthy to veer westwardly and withstand the waves. Apparently Mason did not observe the signals from the barges as he made no effort, at that time, to change his course. In any event, Hilton first noted that the hawser had parted when the tug was about a mile distant proceeding in the direction of Old Point. At that time the barge was not leaking and there were only four inches of water in the Hope—the suction pipe only permitting pumping to three inches. Hilton threw out both anchors, with the Whiteport continuing to swing astern on the couplings. Two hours later Hilton advised Hopkins that the Hope was gaining water. During this period the heavy seas were making contact with the bow end of the Hope and Hilton noticed the excessive quantity of water about an hour after the hawser broke. In effect the Hope was breaking the seas for the Whiteport and was taking the full force of same. After operating his two pumps for an hour and a half or better, and noting that the barge was then "leaking", Hilton decided to abandon the Hope around noon on the day in question. By very excellent manipulation Hilton brought the two barges together and, after assisting his wife and dog on board the Whiteport, he jumped from one barge to the other, thereby averting any loss of life. Personal effects belonging to Hilton and his wife on the Hope were lost and, after the two barges were cut adrift, the Hope ultimately foundered and was towed by the Jonquil to a point inside Lamberts Point and, late the following day, the Linda towed the Hope to Colonna's Shipyard. According to the evidence thus far presented the Hope appears to be a constructive total loss.

A chief boatswain mate attached to the Coast Guard testified that he was the officer in charge of an 83-foot Patrol Boat (wooden hull) on the morning in question, and was stationed at the Little Creek life boat station when, at 11:30 A.M., he received an order to proceed to the "Back River Bay" area to investigate two barges "broken loose and drifting". At approximately 12:15 P.M., the Patrol Boat arrived and found one barge anchored and the other adrift. The Mate (Davis) endeavored to contact one barge without success, and thereupon proceeded to the other barge where he "raised two men". Davis describes conditions as "pretty windy" (30–35 m. p. h.), "chilly", "seas rough", with waves from three to four feet high. At approximately 3 P. M. the Jonquil (not the Patrol Boat) arrived and picked up the Hope. Davis received orders to "stand by" the anchored barge, as the Coast Guard was to send out a larger vessel, or the Jonquil was to return to tow in the Whiteport. Late that afternoon Davis noted that the Whiteport was drifting toward shallow water and he shot a small "line" to the barge. He started to drop the hawser over the side of the Patrol Boat when he saw the two men go below. He then broke the messenger line and left the locality as the weather conditions were more adverse and the seas were heavier. Davis stated that when he arrived at 12:15 P. M., the Whiteport was anchored in 17 feet of water but, when the shot line went over, the barge had drifted into water nine feet in depth. He assigns as a reason for not endeavoring to put a line aboard the barge prior to dusk the fact that the Coast Guard will not take a barge in tow when not in danger and, when the barge commenced to drag anchor, he thought the barge might then be in danger, drifting as it was into shallow water. Davis testified that he saw *one* anchor line out at the forward part of the bow tending to the starboard side, but he did not testify affirmatively that *only* one anchor was in use.

In explanation of the failure to haul in the "shot line", Hopkins and Hilton stated that the line was "hung" under the bow of the barge and, after 45 minutes of effort to free the line, the men went below. No other "line" was shot from the Patrol Boat and it was then dark. The size of the "shot line" is described as similar to a match stick. Both barge Captains testified that there were two anchors out on the Whiteport and that the barge was not leaking. Between eight and nine o'clock P. M., the anchor lines broke and the barge ultimately drifted on the rocks off Fortress Monroe between 11 P. M. and 12 P. M., from which point the parties managed to get ashore. Around 9 P. M. the wind had increased to 40–45 miles per hour. While Hilton and Hopkins disagree as to the location of the anchors of the Whiteport, both insist that the lines on two anchors were out. Hopkins states that all the line (about 300 feet) was out, and estimates the weight of each anchor at 350 pounds, with lines of 3-inch manila rope. This estimate is probably somewhat excessive as the Hope was equipped with two anchors weighing 225 and 300 pounds respectively. There is no evidence before the Court as to the anchor weight required to hold a barge such as the Whiteport under weather conditions existing at the time.

The Whiteport was finally towed to Colonna's Shipyard about one week later, presumably by the Coast Guard as Capt. White admits that respondent did not tow her in.

The evidence rather conclusively shows that, if the towing hawser had not parted, the flotilla would have reached safe harbor. The hawser was purchased on July 7, 1953, for the tug Elizabeth II, a smaller vessel than the Linda. A short time thereafter the hawser was transferred to the Linda after Capt. White added 150 feet to it by splicing same, making a total length of 750 feet. It had been in constant use for 6½ months and, as noted, it had been through some rather "rough" winter weather. Estimates of the time a towing hawser would last varied considerably, but all witnesses admitted that winter weather tended to shorten the life of any hawser. It appears that from six to eight months is the average life of any hawser in use with any reasonable degree of regularity. Capt. White testified that he relied upon the Master of the tug to advise him when a new hawser was needed, and insists that Mason never told him to replace the line in controversy. Mason contradicted this statement and said that parts of the hawser were in "pretty bad shape"; that he reported the matter to White who promised to purchase a new one, but the purchase was deferred. The Engineer, Conway, described the hawser as being in "fair shape" for good weather, but unsuitable for winter towing in the Chesapeake Bay. Hilton indicated that the hawser appeared a bit "frazzled and worn" at a point approximately 35 feet from the bridle when he noticed it while anchored off the channel near Baltimore on the previous day. Dalgarno, the expert witness presented by libellant, testified that, on September 23, 1954, he inspected a portion of the tow line at respondent's place of business, but Capt. White would not permit him to inspect the entire line. He described the line as "very poor". Libellant's Ex. 10, which was attached to the bridle on the forward barge, is in evidence and speaks for itself as to its poor condition. Dalgarno refers to Libellant's Ex. 11 as being somewhat better than the piece of rope near the eye, but even this is not a good rope for towing purposes. This witness states that some hawsers must be replaced every three months but, in any event, they should be examined at such intervals. He suggested that this particular hawser did not break, but probably pulled apart. Again we find Capt. White totally indifferent to any responsibility for inspection. Although he visited the tug every Sunday morning, he refers to these visits as "routine inspections" and, according to the evidence, there is no indication that White ever inspected anything unless his attention was specifically directed to some defect. In fact, he

never looked at the hawser on these Sunday visits. Following the damage to the barges, White saw the hawser and cut about 15 feet from the "frazzled" end, after which he spliced the line and put an eye in it. He admits receipt of a letter dated February 5, 1954 (Libellant's Ex. 12), from proctors for libellants advising him to retain the hawser. He states that he first placed the hawser in a shed at Colonna's Shipyard, and later, upon advice of his counsel, removed it to his garage. He noted that an eye had been cut off the hawser and commented that perhaps the rats had gnawed into the line. Subsequently he cut off a six-foot piece and delivered it to F. K. Carlin for testing. When advised that this was insufficient for testing purposes, he cut an additional 30 feet. This piece was presumedly ultimately sent to the United States Testing Company, Hoboken, New Jersey, and, in an *ex parte* test conducted in March, 1954, showed a strength of 28,900 pounds as contrasted with a breaking load of 31,000 pounds for a new rope. According to marine specifications the factor of safety is five to one, which would indicate that the rope, in a steady pull, would pull approximately 6,000 pounds. So many factors enter into the life of a rope that it is impossible to determine its maximum use for towing purposes. The piece of rope so tested (and later destroyed) was sent to United States Testing Company by the Wall Rope Company (not by F. K. Carlin) and was not otherwise identified or connected with this case by any testimony of Carlin or the officials of Wall Rope Company. While such evidence is of doubtful value, it will be considered as a part of the hawser in controversy.

Capt. White also testified that the Linda will wear out a hawser faster than the tug Elizabeth II, and that lines will deteriorate more rapidly in the winter, particularly when used where there is ice. When all of the evidence is considered [6] and when the peculiar circumstances surrounding the *ex parte* test and "gnawing rats" have been given due weight, it would appear that the application of the principle established in The Vulcan (Riverside Trawling Co. v. Tug), D.C., 60 F. Supp. 158, 1945 A.M.C. 484, should be invoked. It is the opinion of this Court that respondent, prior to removing and cutting the line, should have notified libellants or their proctors in order that appropriate tests could have been conducted by both parties.

Libellant further urges that the Linda was unseaworthy as it did not have sufficient crew on its return trip to Norfolk. There is evidence to the effect that at least four men should have constituted her crew. There is, however, no affirmative showing that a four-man crew could have averted the disaster resulting in the loss of the Hope. In the opinion of the Court it is unnecessary to discuss this point as the Court has reached the definite conclusion that the Linda was unseaworthy and that respondent had knowledge of her condition. The request to limit liability is denied.

While the primary cause of the loss appears to have been the unseaworthiness of the Linda, there is evidence of negligence, both active and passive, on the part of respondent and the crew of the tug. If necessary, it could be argued that Captain Mason should have sought safe harbor under existing conditions, and that he could have been more diligent in obtaining information as to the rough seas in the lower part of the Bay. While it is extremely doubtful that another tug could have secured the barges at the time Capt. White testified he endeavored to get another tug to go to the rescue (the late afternoon of January 22), it is possible that this could have been accomplished had he acted at once upon receipt of Mason's call that the hawser had parted. Obviously White was relying upon the Coast Guard to perform a duty imposed upon him.

6. The deckhand, Gibbs, also testified that the hawser was in "pretty bad shape" and "stranded from one end to the other". Gibbs handled the hawser line.

The authorities on the subjects thus far discussed do not present any problem to this Court. The tug is not an insurer of its tow, nor does it have imposed upon it the duties of a common carrier. It does have the duty of exercising reasonable care and maritime skill as may be employed by prudent navigators for the performance of like services. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; Maryland Transportation Co. v. Dempsey, 4 Cir., 279 F. 94. That the burden of proving unseaworthiness of the vessel rests upon the party asserting same is elementary. The happening of an accident to a tow, in and of itself, raises no presumption of negligence. The Director, 4 Cir., 21 F.2d 47. Any vessel, either as originally designed or as reconstructed, must be stable and properly constructed, and it is no defense that a purchaser of an old vessel is not informed on these points. The Vestris, D.C., 60 F.2d 273, 1932 A.M. C. 863. While there are many authorities cited in the able briefs submitted, it is not essential to analyze them in detail as the ultimate question is substantially factual.

There are, however, two contentions raised by respondent which are worthy of note, as follows:

(1) The effect of the printed paragraph in the written contract of August 25, 1953, and

(2) The applicability, if any, of the decision in The Director, supra.

Respondent relies upon the opinion of Judge Soper in The Winding Gulf, 209 F.2d 410, 1954 A.M.C. 183, to support its contention that respondent is not liable for "wind, weather, errors of navigation or Act of God". A careful reading of this decision and the contractual provisions set forth therein adequately demonstrates that Judge Soper merely applied the "pilotage clause" rule to the facts of that case. It cannot be successfully urged in this case that the master and crew of the Linda became *pro tempore* servants of the tow, and the printed portion of the contract does not so state. There would be no need to even consider this authority unless this Court is in error in interpreting the circumstances surrounding the execution of the contract. Even assuming error on the part of this Court, absent the application of rule involved in "pilotage clause" cases, there appears to be a conflict of authority on the right of a tug owner to contract against his own negligence. *Certainly a tug owner cannot contract against liability occasioned by an unseaworthy condition.* In any event such a contract should not be construed to exonerate a tug owner from his own acts of negligence unless the agreement of the parties on this point is clear and unequivocal. Bisso v. Inland Waterways Corp., D.C.La., 114 F.Supp. 713, 715; 86 C.J.S., Towage, § 75, p. 1038. In the opinion of this Court the agreement between the parties was not clear and unequivocal as to this point.

Respondent also urges that the opinion of Circuit Judge Waddill in The Director, supra, is controlling. The Court did not conclude that the tug (as distinguished from its equipment) in that case was unseaworthy and, from an examination of the record, it appears that the hawser parted nearest the tug, whereas, in the instant case, the break was nearest the barge. This Court is inclined to the view expressed in The Vulcan, 60 F.Supp. 158, 162, where it is said:

"The tug company is confronted with this situation: Either the lines showed evidence of 'considerable' prior use and the Vulcan's master was negligent in using them without having first subjected them to a more careful examination; or the lines were sound and staunch, and parted only because of the extraordinary strain to which they were subjected as a result of the Vulcan's negligent maneuvering."

Since this Court has reached the conclusion that the hawser was not sound, it is unnecessary to further discuss The Director, supra.

This leaves for determination the matter of the unseaworthiness, if any, of the

barges Hope and Whiteport, and the effect of such unseaworthiness (if it exists) on this case.

 As was said in The Director, supra, a vessel using the services of a tug holds itself out to be sufficiently staunch and strong to withstand ordinary perils of the sea to be anticipated on a voyage—the tug also has the right to assume that the tow will carry a competent and sufficient crew. There is, however, no evidence before this Court to the effect that the barges were manned by an incompetent or insufficient crew. In The Director, supra, the Court suggests that the crew on the barge involved was insufficiently manned by the master and his wife, but it will be noted that the barges were ocean-going barges as contrasted with the type barges involved herein.

 The respondent's pleadings do not assert the unseaworthiness of the Whiteport, but this is probably immaterial as the pleadings may be considered as amended to conform to the proof. 2 C.J.S., Admiralty, § 131(b), p. 256. The briefs submitted by proctors for respondents limit the issue of unseaworthiness to an inefficient crew and the improper anchoring of the Whiteport and, as these issues have heretofore been determined adversely to respondent, a further discussion of the Whiteport is unnecessary except as it may relate to the Hope by comparison.

The condition of the Hope raises the real issue in this case which has given the Court some trouble in reaching its final conclusion. The Hope and Whiteport are essentially "sister" barges. A brief description of them is in order:

### Whiteport

Wooden, with rake ends. Built in 1923. Length 110 feet. Breadth 30 feet. Depth 12.7 feet. Tonnage (gross) 423. Draft (light) approximately 26 inches. Draft (loaded) approximately 9½ to 10 feet.

### Hope

Wooden, with rake ends. Built in 1922. Length 110 feet. Breadth 30 feet. Depth 12.7 feet. Tonnage (gross) 425. Draft (light) approximately 26 inches. Draft (loaded) approximately 9½ to 10 feet.

As the barges were designed to carry grain and, therefore, should not be subject to excessive leaking, periodical inspections were made by the United States Salvage Company as representatives of Norris Grain Company. There is no evidence that the libellant ever failed or refused to make any repairs as suggested by the Salvage Company. There is affirmative evidence that, during the year 1953, libellant expended the sum of $5,992 on repairs to the Hope, and the sum of $5,929 on repairs to the Whiteport, although the breakdown of these repairs was not submitted in evidence. When a survey was made in June, 1953, Capt. White was present and "saw to it" that the required work was done. White further testified that the barges were frequently surveyed and, as he described it, "practically every trip".

There is evidence of several loading operations involving these barges in which, contrary to libellant's instructions, the barges were loaded "on bottom" several times. These occasions were described by the witnesses as under varying conditions. Capt. Hilton, on the Hope, testified that at Belhaven, North Carolina, the Hope was loaded with soy beans at a time when she was partly afloat and partly on a sand bottom. Admittedly such loading was improper and is very apt to cause damage to the hull. Even when a portion of the barge is in soft mud, loading under such circumstances is not recommended. At Englehart, North Carolina, Hopkins, the captain of the Whiteport, states that his barge was loaded aground and that the tug pulled her off without other assistance. The witness, Strayer, employed by libellant as the supervisor in charge of loading and unloading operations, stated that the barges Hadley, Hope and White-

port were purchased by libellant in September, 1952; that between August, 1953, and January 22, 1954, the Hope and Whiteport made approximately nine round trips from Baltimore to eastern North Carolina; that the Belhaven loading in December, 1953, was largely due to inadequate docking facilities; that, while Strayer was not present at the time, the tug Elizabeth II was all that was necessary to free the Hope; in September, 1953, also at Belhaven, North Carolina, the Hope was loaded to capacity (25,125 bushels) when the wind shifted, the tide dropped, and the Hope went aground; that Strayer caused a bulldozer to be attached on each side of the barge, thereby pulling the barge off the soft mud by breaking the suction; that, according to Strayer, there was no damage to the Hope as a result of this operation. Strayer further stated that Norris Grain Company required surveys every 30 days and only on one occasion (involving the Hadley) 'had any complaint been made which concerned dampness to approximately 40 bushels of corn. He admitted that the barges required almost constant caulking before each trip but the evidence does not indicate this was done. He stated that the surveyor for the cargo had removed boards at some time to determine the structure and condition of the barges. Summarizing the number of times the barges had been aground, he refers to the Hope as having been once completely aground (at Belhaven on September 25, 1953) and once partially aground (at Belhaven in December, 1953); the Whiteport once partially aground (at Englehart); and the Hadley once partially aground. He distinguishes between "aground" and "partially aground" by indicating that if a tug can successfully pull the barge off the ground without other assistance, the barge is only "partially aground". Strayer insists that Capt. White passed on all complaints relative to the barges and respondent's Ex. 11 so indicates. After the incident on September 25, 1953, Strayer states that the Hope was completely caulked and no further complaints

were received, but the repair bills only indicate temporary repairs and a moderate degree of caulking. While some of the repair items for these barges were accomplished in Baltimore for which invoices were not submitted, respondent's Ex. 7C (June 23, 1953), Ex. 7D (September 21, 1953), and Ex. 7E (October 19, 1953), indicate the nature of the repairs at Colonna's Shipyard and reveal some degree of caulking following the damages in September, 1953.

The expert witnesses, William Dalgarno for the libellant and Capt. Anderson for the respondent, differ sharply as to the seaworthiness of the Hope and, to a lesser degree, the Whiteport. At the time Dalgarno surveyed the barges in February, 1954, he stated that the Hope "had been through hard treatment"; that there was some rotten wood in the barge, but he believed she could be repaired, although he indicated his survey of the Hope had not been very extensive. The Whiteport was then in the process of repair and there was no sign of "sag" (center portion of the barge below ends) or "sourness". Anderson's inspection, admittedly more complete as to the Hope, indicates rather clearly an unseaworthy condition of the barge on January 27–28, 1954 (after she foundered). With the exception of respondent's Ex. 10 (depositions), Anderson stated that the *external planking and caulking* of the Hope was in fair condition (the exhibit in question indicates planking approximately seven feet above the light water line to be partially missing and the remainder of the planking in a rotted condition). There was, however, according to Anderson and the photographs introduced in evidence by respondent at the time of the taking of Anderson's deposition, substantial damage to the interior structure of the Hope, particularly to the longitudinal keelsons which were in an advanced deteriorated condition.

While the burden rests upon respondent to prove the unseaworthiness of the Hope, it is the opinion of this Court that this burden has been met and that the Hope was unseaworthy when

she left on her trip to Baltimore and return. The damages or loss to the Hope will, therefore, be divided between libellant and respondent.

The Court is persuaded to this conclusion, not only from the physical facts as revealed by the photographs and Anderson's testimony, but also by what actually took place as related to the Whiteport. It is true that the Hope, as the lead barge, took the wake of the tug, the strain of its hawser, and the strain of the Whiteport from astern, as she proceeded southerly toward Norfolk down the Chesapeake Bay. It is vigorously contended by libellant that these factors are sufficient to explain what happened to the Hope as contrasted to the Whiteport. But the admitted evidence is that barges in tow are subjected to less strain than at anchor. Following the parting of the hawser, the Hope was anchored for approximately two to three hours before Capt. Hilton abandoned her after she "sprung a leak". During this period the Hope again admittedly took the burden of the storm while the Whiteport remained in a somewhat sheltered position. After the Hope was cut adrift, the Whiteport anchored and remained at anchor, without any substantial leakage, for approximately nine hours when the anchors commenced to drag and she drifted on the rocks at Fortress Monroe. The Court is of the opinion that the unseaworthiness of the Hope concurred in and contributed to its loss or damage. In the opinion of District Judge Groner in The Director, supra (Civil No. 4331, Eastern District of Virginia, at Norfolk), a comparable situation existed where one barge went aground and the other rode at anchor. While it is true that the barge going aground (Haggett) was considered as unseaworthy because of insufficient crew and inadequate anchors, Judge Groner was obviously persuaded in his conclusion in view of his statement:

"In view of the fact that all of the other barges rode out the storm and his ability to hold even with one anchor from time to time, with a little Kedge anchor and a Manilla rope attached to it for several hours, I think I would not be justified in saying that the failure to have two anchors, to anchor with two anchors, was not a contributing cause of this disaster."

The principle involved in Judge Groner's reasoning is applied with even greater force to the factual situation existing in this case.

While Judge Coleman's opinion in The Carroll, D.C., 60 F.2d 985, effectively points out that the fact of one vessel's ability to remain afloat under given conditions is not sufficient to raise a presumption of another vessel's unseaworthiness, if she sinks under the same conditions of wind and sea, it should be noted that there was no evidence of keelsons being in an advanced state of deterioration in The Carroll. Such a condition as in the instant case was a known factor clearly revealed by the evidence and photographs. The factual situation distinguishes this case from the controversy before Judge Coleman.

It is urged that the doctrine of the Scow Covered Wagon, 4 Cir., 200 F.2d 33, 1952 A.M.C. 2034, is applicable and that, even though the scow's infirmities created and fostered her peril, the *sole proximate cause* of the loss was the failure of the tugmaster to forestall the disaster. The factual picture in the case at bar is distinguishable and this Court is unable to reach the conclusion that the unseaworthiness of the Hope was not a contributing proximate cause. The common fault of negligence and unseaworthiness of the Linda and the unseaworthiness of the Hope both contributed to the loss of the Hope. The costs in this case should likewise be divided on the basis of three-fourths being paid by respondents and one-fourth being paid by libellants.

While an interlocutory decree will be entered with respect to liability, the damage or loss to the Hope being divided and the damage to the Whiteport being charg-

ed solely to respondent, this Court should dispose of the claims of Lloyd M. Hilton and Ruth Hilton. Their physical injuries, if any, were admittedly slight. Mrs. Hilton sustained no physical injuries and submitted no proof of medical expense. She was exposed to the weather, made highly nervous, and sustained some shock by reason of her narrow escape from drowning. Her claim of nervousness is somewhat abated by her frank statement that she is now, and always has been, nervous when she goes to sea with her husband. Following this incident, she was confined to bed for about ten days and states that she "almost had pneumonia". Lloyd M. Hilton testified that he "knocked some skin off the back of his right hand" and a little skin "off the leg". Both of these libellants underwent a very harrowing experience. Their claims for loss of personal effects are as stated in answers to interrogatories, but are varied by the following admissions:

(1) The item of cash in the sum of $65.00 is eliminated by agreement.

(2) The proof further indicates the loss of a radio valued at $24.95 and a watch (not valued) as a part of Capt. Hilton's loss.

(3) The valuations given are the cost to the parties, with no regard for depreciation and admittedly the average age of the items was two years.

(4) The proof indicates an additional suitcase lost by Capt. Hilton at a cost price of $3.95 and a change in the cost of Mrs. Hilton's suitcases to a like figure.

The computed cost price of the items lost by Mrs. Hilton (as adjusted) is $222.70. The computed cost price of the items lost by Capt. Hilton (as adjusted) is $373.46. Allocating 40% depreciation to all items, Ruth Hilton is entitled to recover, for the loss of her personal effects, the sum of $133.62, and Lloyd M. Hilton is entitled to recover, for the loss of his personal effects, the sum of $224.08. Each of said parties is allowed the sum of $300 for pain, suffering, and mental anguish.

Prior to the preparation of this opinion, proctors for all parties were advised with respect to the conclusions of the Court and were requested to submit such additional authorities, if any, relative to the application of the rule of divided damages in connection with the claims of Lloyd M. Hilton and Ruth Hilton. Proctors for Norfolk Towing Corporation, claimant-respondent herein, have now filed a motion to amend its answer in this case. In the opinion of the Court this motion should be granted and the interlocutory decree to be entered herein should recite that the claimant-respondent has been granted permission to file said motion. There is little need to require the claimant-respondent to file an independent proceeding against Glen Southern Shipping Corporation for contribution under the Virginia statute as far as the claims of Lloyd M. Hilton and Ruth Hilton are concerned. It would appear that the claimant-respondent is proceeding properly under the rule stated in Patterson Oil Terminals, Inc., v. The Port Covington, 3 Cir., 205 F.2d 694.

In view of the autorities cited in Benedict on Admiralty, Vol. 3, § 417a, p. 187, it appears that the divided damage rule should apply with respect to the loss and/or damage to the barge Hope, and to the losses and judgment for pain, suffering and mental anguish in connection with the claims of Lloyd M. Hilton and Ruth Hilton.

This opinion is adopted by the Court as its findings of facts and conclusions of law, with the right of proctors to submit any other specific inquiries as to findings of facts or conclusions of law which may have been omitted herein.

A decree will be entered upon presentation.